[Crim. No. 16520. In Bank. Feb. 20, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL CLAYTON BRISENDINE, Defendant and Appellant.

530

**COUNSEL**

Garza, Kassel, Jordan & Welebir and Donald W. Jordan, Jr., for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Derald E. Granberg and Conrad D. Petermann, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MOSK, J.**—Defendant was charged with possession of marijuana (former Health & Saf. Code, § 11530, now § 11357) and possession of a restricted dangerous drug (former Health & Saf. Code, § 11910, now § 11377). His motion to suppress the evidence on the ground of illegal search and seizure (Pen. Code, § 1538.5) was denied. Following an unsuccessful petition for mandamus the matter was submitted to the trial court on the transcript of the preliminary hearing. Defendant was found guilty on both counts and placed on probation. He appeals from the order granting probation (Pen. Code, § 1237), contending that the contraband was obtained by means of an unlawful search and seizure.

I

On the night of June 3, 1970, two deputy sheriffs, Rodney Denney and Michael Norman, were inspecting for county fire code violations in the Deep Creek area of the San Bernardino National Forest. The locale had been designated a "high fire hazard area" in which both open campfires and overnight camping were prohibited.

Upon finding two vehicles parked on the road the deputies proceeded into the forest on foot, where they came upon one Marlow Bartels, a lone

camper whom they arrested for possession of marijuana.[1] Bartels informed the officers there were other campers further downstream who were also in possession of marijuana. The officers secured Bartels' wallet for identification, instructed him to remain at his campsite pending their return, and continued in the direction indicated.

The trail from Bartels' campsite was primitive. Large rock formations and deep canyon walls necessitated the use of hands in many places; at some points the narrowness of the route allowed only one person to pass at a time. Approximately half a mile from the place where they left Bartels the officers observed another campfire. Nearby were four young men in sleeping bags, one of whom was this defendant. Officer Norman placed the four under arrest for having an open campfire in violation of section 13 of appendix E of the Uniform Fire Code of San Bernardino County.

The intent of the officers at the time was to escort the youths out of the area and back to the patrol car, where they would be cited for the fire ordinance violation and ordered to appear before a magistrate at some future date. There was no intent to place the four in custody preparatory to any booking. The deputies justified the need to escort the campers out of the forest on the dual rationale that (1) camping was prohibited in the area and (2) they had left their citation books in their patrol car.[2]

Prior to starting back, the officers conducted a thorough search of the persons and effects of all four youths. Denney picked up defendant's knapsack, squeezed it, determined that the outer layer was too solid to ascertain whether it contained weapons, and began a search of its compartments. The contraband was found in a side pocket of the pack: the marijuana was contained in a frosted plastic bottle with a cap on it, and the tablets of restricted dangerous drugs were wrapped in tinfoil and enclosed in envelopes.

---

[1] The record does not disclose the circumstances of Bartels' arrest.

[2] These facts are clear from the testimony of the officers:

"Q: And was it your intention initially upon approaching to issue notices to appear to all the four subjects for the illegal open fire? A. [Officer Norman] Yes, sir. It would have been necessary to bring them back to our patrol vehicle. We didn't bring cite books with us.

" . . . . . . . . . . . . . . . . . . . . . . .

"Q. Well, my question is why did you decide to take them out of the Deep Creek area at all? A. [Officer Denney] Well, there is no overnight camping down there. There is a sign posted at the entrance into Deep Creek, 'No overnight camping.'

"Q. So even if you had cited them, you would have removed them from the vicinity of the Deep Creek, am I correct? A. Yes, sir. We have done this many times."

Following the search and confiscation of the contraband the four suspects were removed from the area and escorted back to the patrol car. Defendant was taken into custody; his three companions were given citations, made to sign promises to appear, and released.

Defendant attacks the legality of the search of his knapsack and the seizure of the contraband on the following grounds: (1) the evidence indicates that the police were conducting an exploratory search for narcotics, not weapons; (2) there were no specific, articulable facts or circumstances which reasonably warranted a search for weapons; and (3) even if the officers had a limited right to search for weapons, the extent of the search undertaken exceeded its legitimate scope.

For the reasons discussed *infra* we conclude there was substantial evidence to support the trial court's finding that the search was legitimately concerned with weapons and not contraband. Similarly, since it was necessary for the officers to be in close proximity with defendant and his companions for a prolonged period of time, we are of the view that the circumstances reasonably warranted such a weapons search; that being the case, the officers were justified in investigating further when a pat-down of defendant's knapsack proved inadequate to disclose if it contained weapons. However, we hold that the officers' subsequent intrusion into the opaque bottle and envelopes inside the knapsack cannot be justified by the limited purpose which validated the search in its inception. Accordingly, we hold these items were obtained by means of an unreasonable search and seizure in violation of article I, section 13, of the California Constitution.[3] We shall discuss these points in the sequence indicated.[4]

## II

■ It is true there was evidence presented which could have led the trial court to conclude that the ostensible weapons search was merely a facade designed to provide justification for an exploratory search for narcotics. If such were the case, of course, the search would have been

[3]Article I, section 13 (former art. I, § 19), provides: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable seizures and searches may not be.violated; and a warrant may not issue except on probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons and things to be seized."

[4]As a threshold matter we observe that the burden of justifying the warrantless search in the case at bar was on the prosecution. (*Badillo* v. *Superior Court* (1956) 46 Cal.2d 269, 272 [294 P.2d 23].)

illegal. (*People* v. *Superior Court (Kiefer)* (1970) 3 Cal.3d 807, 830-831 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559]; *Cunha* v. *Superior Court* (1970) 2 Cal.3d 352, 358 [85 Cal.Rptr. 160, 466 P.2d 704]; *People* v. *Cruz* (1968) 264 Cal.App.2d 437, 441 [70 Cal.Rptr. 249].) The search process was lengthy and exhaustive.[5] In view of the fact that Bartels had told the officers that the campers were in possession of marijuana, the evidence might have supported an inference that the investigation was made in the hope of discovering such contraband. In addition, objects at the campsite which could have been readily utilized as weapons were largely ignored by the officers, and the arrestees were allowed to retain control of them during the long trek back.[6] Finally, the deputies seemed to exhibit little fear of the suspects, frequently turning their backs to them during the course of the search[7] and taking no steps to secure them either during the search, on the trip back, or at the patrol car.

■ On the other hand, the testimony of the officers suggests that under the circumstances they had cause to fear for their safety. Officer Denney explained, "Primarily because of the terrain, we could not secure them. We had at that time arrested them, taken their freedom away from them. I had never seen any—either [*sic*] four of the suspects before. I did not know their background, their past, or if they were wanted personnel. I didn't know if they had weapons or what type of attitude they would have when we escorted them out of the Deep Creek area. I would have been in dereliction of my duty if I didn't search for weapons."

Thus the terrain, the lateness of the hour, and the unfamiliarity of the suspects might well have led a prudent officer to take reasonable precautions. The trial court impliedly found this was the deputies' purpose, stating, "I think it was . . . proper to search for weapons." As an appellate court we are bound to " 'view the evidence in the light most

[5]The search included all the clothing, sleeping bags, and gear of the campers. The area was also searched for additional suspects. One of defendant's companions testified that the officers looked under the rocks of the campfire and shone lights in the water of the nearby stream.

[6]These potential weapons were a hunting knife and a camping hatchet which were stuck in a log within arm's reach of one of defendant's companions. The items remained in the log throughout the search, and were carried back by the campers.

[7]This fact alone has been cause in other cases to bring into question the legitimacy of an ostensible weapons search: " 'To say that the officer who turns his back on the driver whom he has arrested, while he first searches the driver's automobile is conducting a reasonable search incident to the arrest and not conducting an exploratory search staggers the credulity of anyone who pauses to examine the reasoning.' " (*People* v. *Superior Court* (1970) *supra*, 3 Cal.3d 807, 830, quoting *Grundstrom* v. *Beto* (N.D.Tex. 1967) 273 F.Supp. 912, 918.)

favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*Guidi* v. *Superior Court* (1973) 10 Cal.3d 1, 10, fn. 7 [109 Cal.Rptr. 684, 513 P.2d 908].) Our responsibility is simply "to measure the facts, as found by the trier, against the constitutional standard of reasonableness." (*People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].) We conclude that the court's determination that the object of the search was weapons is supported by substantial evidence and cannot be disturbed on appeal. (*People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649], and cases cited.)

### III

Defendant next contends that, assuming the search was for weapons, it was illegal because the officers could not point to specific, articulable facts justifying such a search. He principally relies on *People* v. *Superior Court* (1972) 7 Cal.3d 186, 202-206 [101 Cal.Rptr. 837, 496 P.2d 1205] (hereinafter called *Simon*), for the proposition that if an arrestee is cited for an offense which typically has neither "instrumentalities" nor "fruits," no search is allowable unless there are particular facts present which would reasonably lead the officer to believe the subject was armed.

In analyzing the present case in light of *Simon* we encounter first a difficulty in classification. There, in reviewing the permissible scope of a search incident to an ordinary traffic arrest, we were able to divide offenders into three discernible groups (7 Cal.3d at pp. 199-201): (1) those who are merely cited and immediately released (Veh. Code, §§ 40500, 40504), (2) those who may or must be taken before a magistrate and given the option to post bond (Veh. Code, §§ 40302, 40303), and (3) those who are arrested for felonies and booked according to the general Penal Code provisions on felony arrests (Veh. Code, § 40301; Pen. Code, § 7, subd. 21).

Classification into one of the foregoing categories is essential to analysis, since both the justification and the scope of a weapons search incident to an arrest are dependent on the relative danger to the officer presented by each type. Here, while it is clear that defendant's arrest could not be placed in the third category, it is arguably similar to either of the remaining two. The officers' intention prior to the discovery of the contraband was simply to cite defendant for his fire code violation and allow him to continue on his way. The analogy to procedures followed

under Vehicle Code sections 40500 and 40504 is apparent. Yet to accomplish this result in the case at bar it was necessary for the officers to travel in close proximity with defendant for a considerable period of time, substantially increasing the risk to the officers if in fact defendant were armed. The situation thus appears more akin to that in which an officer transports a suspect before a magistrate, even if bond can then be posted and a prebooking search avoided.

In the latter instance a "pat-down" or limited search for weapons is permissible; in the former it is not. As Chief Justice Wright explained in his concurring opinion in *Simon* (7 Cal.3d at p. 214): "When it becomes necessary that an officer confine a traffic law violator within his police vehicle, the officer risks the danger that the violator may be armed with and draw a weapon. This danger is not necessarily eliminated by handcuffing the traffic law violator as he may still be able to reach a weapon secreted on his person. And, incident to the entire process of transportation, it may be impossible for the officer to keep the violator under constant surveillance by reason of the requirements of driving the vehicle and other responsibilities.[8] In my opinion, the specifically articulable fact of the increased danger to the officer reasonably warrants the limited or relatively minor intrusion of the pat-down search in those instances when traffic law violators are transported to a magistrate pursuant to the provisions of Vehicle Code sections 40302 or 40303."

We agree with this reasoning.[9]  █  We conclude that where, as here, the exigencies of the situation require that officers travel in close proximity with arrestees, a limited weapons search is permissible even though the charge will ultimately be disposed of by a mere citation. In so holding we are mindful of "the dangers daily faced by the men who bear the burden of policing our streets and highways, and of the fact that even a minor . . . citation incident can occasionally erupt into violence."

[8]These problems were exacerbated in the case at bar. Here the journey back took nearly two hours, much of it in darkness after the batteries in the officers' flashlights failed. The strenuousness of the journey required the cooperation of all six hikers in aiding one another in climbing, portaging, etc. For most of the trip the officers had no idea where each of the arrestees were, and they arrived back at the patrol car not as a unit but in staggered groups, with the earliest arrivals forced to wait for a time until the others caught up.

[9]The few post-*Simon* cases dealing with this issue have so held. For example, in People v. Ramos (1972) 26 Cal.App.3d 108 [102 Cal.Rptr. 502], a pat-down of a hit-and-run suspect was conducted prior to placing him in a police vehicle for transportation back to the scene of the accident. The search uncovered a switchblade knife, and the defendant was arrested for its possession. The defendant was not under arrest at the time of the search, but the fact of transportation in the police vehicle was held sufficient to justify the pat-down.

(*People* v. *Superior Court* (1970) *supra*, 3 Cal.3d 807, 829.) Each case must be decided on its own facts (*id.,* at p. 827; *People* v. *Ingle* (1960) 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 348 P.2d 577]), and there is "no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails." (*Terry* v. *Ohio* (1968) 392 U.S. 1, 20-21 [20 L.Ed.2d 889, 905, 88 S.Ct. 1868].) Here the officers' interest in protecting themselves while escorting unknown arrestees in a primitive location in the nighttime outweighed defendant's interest in protecting his person and effects from search. Under the circumstances, a pat-down search for weapons was authorized.

## IV

■ But this conclusion does not end our inquiry, for it is well settled that "a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." (*Terry* v. *Ohio* (1968) *supra,* 392 U.S. 1, 17-18 [20 L.Ed.2d 889, 903-904].) The issue is thus dual: "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." (*Id.,* at p. 20 [20 L.Ed.2d at p. 905].)

Defendant contends that the search of his knapsack exceeded the legitimate purpose for which a search was authorized. Yet rather than presenting a single "scope" issue the search of the pack poses three such problems, a fact only cursorily alluded to by either party. The first is the question of the validity of any search of defendant's effects, including the pack; second, the search of the interior of the pack; and third, the search of the bottle and envelopes containing the contraband. As each involves different considerations we will discuss them seriatim.

## A

The People cite *Chimel* v. *California* (1969) 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034], for the proposition that "it is reasonable for the arresting officer to search the person arrested or an area within which he might reach for weapons in order to remove any weapons the latter might seek to use in order to resist arrest or effect escape." The People recognize that in traffic violation cases such a search must be predicated on specific facts or circumstances giving the officer reasonable grounds to believe that weapons are present. (*People* v. *Superior Court* (1970) *supra,* 3 Cal.3d 807, 829; *Simon,* at p. 206 of 7 Cal.3d.) Since the knapsack was

within defendant's area of control at the time of the arrest,[10] and since the arrest was for a nontraffic offense, it is urged that the search of the pack was per se justified by the fact of the arrest.

Defendant contends that *Chimel* is inapposite, and that even assuming the right to search his person for weapons, the pat-down of the pack was not authorized because (1) there was no evidence the pack contained weapons and (2) if the officers feared the possibility that a weapon was contained therein they should have simply removed the pack from his area of control.

Preliminarily, it should be noted that the traditional rationale of warrantless searches incident to arrests is the two-fold need to uncover evidence of the crime and weapons which might be used to injure the arresting officer or effect an escape. (*Preston* v. *United States* (1964) 376 U.S. 364, 367 [11 L.Ed.2d 777, 780, 84 S.Ct. 881]; *United States* v. *Rabinowitz* (1950) 339 U.S. 56, 72-75 [94 L.Ed. 653, 663-665, 70 S.Ct. 430]; *Agnello* v. *United States* (1925) 269 U.S. 20, 30 [70 L.Ed. 145, 148, 46 S.Ct. 4, 51 A.L.R. 409].) According to one writer, "a thorough search of the case law reveals no other justifications for warrantless searches incident to arrest which do not collapse upon careful inspection into one of the two bases." (Note, *Scope Limitations for Searches Incident to Arrest* (1969) 78 Yale L.J. 433, 434, fn. 12.) This basic limitation was reaffirmed in *Chimel:* "When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape . . . . In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule." (*Chimel* v. *California* (1969) *supra,* 395 U.S. 752, 762-763 [23 L.Ed.2d 685, 694].)

In the present case there could, of course, be no basis for a belief that the search of the pack would disclose evidence of the crime. The charge was maintaining an illegal campfire, and as with traffic violations, there can be neither "instrumentalities" nor "fruits" of that offense. Thus the only possible rationale for a search of defendant's knapsack was to uncover weapons.

---

[10]There was a minor conflict in the testimony regarding the distance of the pack from defendant, the officers stating two to three feet, the arrestees claiming it was six feet or more away. The conflict is irrelevant, however, since *Chimel* is not dispositive of this case.

Similarly, we see no difference between traffic cases and the instant matter in terms of requiring the officer to point to the specific reasons why he believes weapons may be present.  ■  Defendant was arrested for one of the most minor of nontraffic violations—a mere citation offense. In such a case the fact of the arrest does not justify a search of the belongings of the person cited: there can be no instrumentalities and there can be no fruits, and absent some showing on the part of the officer that he has good cause to fear for his safety, there can be no weapons search.

In the case at bar, however, the specific, articulable facts required to justify the latter search were shown. As discussed above, the nature of the terrain, the lateness of the hour, and the unknown capabilities of the campers could well have given a prudent officer cause to take reasonable precautions. For this reason we concluded that a pat-down of the persons of the arrestees was authorized. These considerations also validate a limited search of any effects (1) which must necessarily have accompanied this caravan out of the wilderness, and (2) which there was no ready means of withholding from the arrestees during the journey. It would indeed be unwise to forbid an officer to ascertain by the least intrusive means possible whether containers such as the knapsack in the present case harbored a deadly weapon. Were the container a paper or plastic bag, a simple squeeze would be adequate for this purpose. But to allow the arrestee to carry the bag, and at the same time to deny the officer an opportunity to determine if its contents are dangerous, would be a patently unwarranted exposure of the officer to potential harm. On balance we see no reason to exalt the interest of the arrestee in remaining free of the relatively minor intrusion of a pat-down of his belongings over that of the officer who must travel with those belongings under the physically difficult circumstances presented here.

But defendant suggests there was no necessity for the deputies to be concerned about the contents of the knapsack: if they feared for their safety during the search of defendant's person, it is argued, they need only have removed the pack from his area of control; and if they experienced a like fear concerning the trip back they should simply have given defendant the option of leaving the pack at the site, unsearched.

The counterargument that it was necessary to carry the pack out in order to protect it from theft is unsound. In *People* v. *Miller* (1972) 7 Cal.3d 219, 223-224 [101 Cal.Rptr. 860, 496 P.2d 1228], we rejected that contention in the context of personal property of considerably more value and in an area of considerably higher risk of theft than the instant

case.[11] It is true that in *Miller* the defendant expressly forbade the police to remove his property for "safekeeping," while here it is uncertain from the record whether the campers were ever given the option of objecting. However, we do not regard this as a valid distinction. In *Mozzetti* v. *Superior Court* (1971) 4 Cal.3d 699 [94 Cal.Rptr. 412, 484 P.2d 84], the automobile in question was searched following the defendant driver's emergency hospitalization after a traffic accident, and it is clear there was also no opportunity for objection. Accordingly, a search of the knapsack in the present case cannot be justified on the theory that it was necessary to remove it from the area in order to secure it from theft.

But a far more persuasive justification is available in the very illegality of the campsite itself. If defendant had been camped legally and it was necessary to temporarily remove him from the area for a citation unrelated to his presence in the forest, we might well be persuaded that he could demand his effects remain at the camp, unsearched, pending his return. Yet it is clear that the very existence of a campsite at this location was a violation of a county ordinance. Thus the officers were well within their authority in insuring that the violation cease. This included the breaking of camp, the extinguishing of the fire, and the removal of sleeping bags and other camping equipment from the area. Defendant's knapsack was just one of the many items at the site which could be cursorily examined by means of pat-down under the peculiar circumstances presented.

Once again we emphasize that in reviewing a warrantless search to determine the reasonableness of its breadth a court is ill-advised to apply hard and fast rules. Rather we must be concerned, in a case-by-case analysis, with whether the extent of the search exceeded the attainment of the objectives which justified its inception. ■ Here we have found that under the circumstances (1) the officers had a legitimate apprehension for their safety; (2) there was a necessity to escort the arrestees a considerable distance over primitive terrain in the nighttime; (3) it was also necessary that the effects of the arrestees accompany them; and (4) there was no practical way the officers could have negotiated the difficult trek back and at the same time assure that the arrestees would not be able to gain access to a weapon secreted in their gear. Under these facts, a pat-down search of defendant's pack was authorized.

[11]In *Miller* the arrest took place at 3 a.m. in an abandoned private parking lot in South San Francisco. The back seat of the defendant's vehicle contained electronic and musical equipment of apparent also considerable value. The area in question had a high incidence of burglary. Here the remoteness of the locale would render the possibility of theft unlikely, but in addition if security were desired, the use of a standard wilderness cache would be sufficient to allay any concern in this regard.

B

■ Assuming the pat-down of the knapsack was allowable, however, the next query is directed to the search of its interior. The People contend that "where there will be continued accessibility to a large knapsack by an arrested party and the resilience of the knapsack frustrates the effectability of its pat-down, then the officer is warranted in searching the inside of the knapsack for weapons." Officer Denney testified that when he touched the knapsack it felt "substantially solid," that he was unable to determine its contents by squeezing, and that the pocket of the pack was at least large enough to have contained a .22 caliber pistol.

The sole justification for such a search is "the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." (*Terry* v. *Ohio* (1968) *supra*, 392 U.S. 1, 29-30 [20 L.Ed.2d 889, 910-911].) In the ordinary *Terry*-type pat-down, occurring as it does in the context of a street frisk, an intrusion further than the outer clothing of the suspect is allowable only if the initial limited exploration discloses potential instruments of assault. (*Sibron* v. *New York* (1968) 392 U.S. 40, 44-45 [20 L.Ed.2d 917, 924-925, 88 S.Ct. 1889].) To properly exceed the scope of a pat-down the officer must be able to point to "specific and articulable facts reasonably supporting his suspicion" that the suspect is armed. (*People* v. *Collins* (1970) 1 Cal.3d 658, 662 [83 Cal.Rptr. 179, 463 P.2d 403].) The burden of establishing these facts rests with the People. (*Ibid.*, citing *People* v. *Johnson* (1968) 68 Cal.2d 629, 632 [68 Cal.Rptr. 441, 440 P.2d 921].)

There seems to be no reported case in this state dealing with the precise issue of the permissible scope of a search of belongings of an arrestee which in its inception was limited to a pat-down. Thus it is incumbent upon us once again to examine the parameters in light of the rationale which originally justified the search.

In the ordinary pat-down circumstances the clothing of the person is seldom, if ever, so resistant or resilient as to prevent the police from determining whether there are weapons present. But if in some unique fact pattern such were the case, we would likely be persuaded that a limited further intrusion was necessary. To do otherwise would be to make the unreasonable demand that an officer allow a potentially armed suspect to enter his patrol car. We noted above that even in the

ordinarily innocuous confrontation between an officer and a traffic arrestee who is to be transported before a magistrate, there is the possibility of violence. As said in *Simon,* "The critical factor in these or similar situations is not the greater likelihood that a person taken into custody is armed, but rather the increased likelihood of danger to the officer *if* in fact the person is armed." (7 Cal.3d at p. 214; Wright, C. J., concurring.)

Here, as we have noted, it was necessary that the knapsack accompany the officers out of the area. Yet a simple pat-down of its exterior proved insufficient to allay the fear that the interior might contain a weapon. None of the campers had identification, and as Officer Denney testified, there was no way of ascertaining whether they were "wanted personnel." If the suspects were indeed wanted and fearful of the warrant check by radio that would likely occur upon reaching the patrol car, then the journey back might well provide their last opportunity for escape. Under these circumstances, therefore, the deputies were justified in protecting themselves by looking into the interior of the knapsack for weapons.

## C

When Officer Denney opened the side pocket of the knapsack he found a frosted, opaque plastic bottle and a pair of envelopes. Because of the translucent but nontransparent nature of the bottle, the People could not rely on the exception to the warrant requirement for objects or contraband found in plain view. (Compare *People* v. *Block* (1971) 6 Cal.3d 239 [103 Cal.Rptr. 281, 499 P.2d 961] [contraband found in clear plastic vial during valid search of premises for additional suspects].)

Nor can the People's burden be discharged by the assertion that the bottle and envelopes might possibly contain unusual or atypical weapons. In *People* v. *Collins* (1970) *supra,* 1 Cal.3d 658, we rejected that contention as applied to a "little lump" felt during the course of a pat-down. We there expressly disapproved of the approach taken in *People* v. *Armenta* (1968) 268 Cal.App.2d 248, 251 [73 Cal.Rptr. 819], in which it was fancifully theorized that such a soft object might have been a " 'rubber water pistol loaded with carbolic acid.' " *Collins* made explicit the rule that "an officer who exceeds a pat-down without first discovering an object which feels reasonably like a knife, gun, or club must be able to point to specific and articulable facts which reasonably support a suspicion that the particular suspect is armed with an atypical

weapon which would feel like the object felt during the pat-down." (1 Cal.3d at p. 663.)

Conversely, of course, if the pat-down discloses an object which reasonably feels like a weapon, further intrusion may be necessary and permissible. Thus in *People* v. *Mosher* (1969) 1 Cal.3d 379 [82 Cal.Rptr. 379, 461 P.2d 659], a *Terry*-type pat-down of a burglary suspect revealed a "sharp object like a knife blade." On further investigation the object was found to be a watch band belonging to a murder victim. Yet while upholding the search in that instance we were careful to distinguish the "knife blade" there from "A box of matches, a plastic pouch, a pack of cigarettes, a wrapped sandwich, a container of pills, a wallet, coins, folded papers and many other small items . . . [which] do not ordinarily feel like weapons." (*Id.,* at p. 394.)

If such ordinary objects are not to be intruded upon when *felt,* then a fortiori such intrusion is unjustified when the commonplace is *seen.* Here Officer Denney found a bottle approximately the size of a pill container, together with a manila envelope and an airmail envelope. Perhaps if the envelopes had been large enough and bulky enough to have contained weapons we would be persuaded that it would not have been unreasonable to feel their contents by squeezing them. However, that is not what occurred. Officer Denney unscrewed the bottle and found marijuana; he opened the envelopes and found tablets of restricted drugs. No one can rationally maintain that such actions were necessary for his protection.[12]

To briefly summarize our holding: Typically in cases of warrantless weapons searches the police must be able to point to specific and articulable facts which reasonably justify a belief that the suspect is

[12]Even prior to *Simon* there was authority in California supporting this view. In *Amacher* v. *Superior Court* (1969) 1 Cal.App.3d 150 [81 Cal.Rptr. 558], the police conducted a pat-down search of an individual who was present at the time a third person was being arrested. The officers categorized the pat-down as self-protective. During the search they came upon a "hard object" in defendant's front jacket pocket, which upon further investigation was found to be a closed flip-top Marlboro cigarette box. The package was opened and marijuana discovered. In granting a writ suppressing the evidence the court stated that "Although the self protective frisk was justified, the opening of the cigarette package does not meet the second prong of the *Terry* test. . . . The officer admitted that his concern ended when he saw that the hard object in petitioner's pocket was a cigarette package rather than a weapon. He testified that he opened the package not in search of a weapon, but in search of marijuana. At that point the scope of the search was no longer reasonably related to the circumstances which justified the frisk." (*Id.,* at p. 154.) Contrary authority typified by *Morel* v. *Superior Court* (1970) 10 Cal.App.3d 913 [89 Cal.Rptr. 297] [allowing full body searches of traffic offenders], and relied on by the prosecution in the court below, was expressly disapproved in *Simon.* (7 Cal.3d at p. 211.)

armed. In the ordinary citation situation the fact of the arrest alone will not supply this justification and additional facts must be shown. In the case of transportation in the police vehicle, however, or in the analogous circumstance here, the necessity of close proximity will itself provide the needed basis for a protective pat-down of the person. To intrude further than a pat-down, the officer must provide additional specific and articulable facts necessitating the additional intrusion.

Here these additional facts were present by reason of the necessity that the campers' effects accompany the officers and the impossibility of securing them in a place where access was precluded. Thus the officers could go beyond a pat-down of the outer clothing and conduct a similarly limited search of the relevant items. Indeed, even an inquiry into the interior of the pack was permissible when the pat-down of the exterior proved impractical. But once confronted with a purely innocent interior it was again incumbent upon the officers to explain why still further intrusion was required. As to such explanation, the record is silent.

■ Accordingly, since the contraband was illegally seized in violation of article I, section 13, of the California Constitution, we hold that it was erroneously received in evidence. (*People* v. *Cahan* (1955) 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513].) Inasmuch as it constituted the sole evidence against defendant, its admission was prejudicial error and the judgment (order granting probation) must be reversed.

V

The People finally contend that notwithstanding the invalidity of the search under California law, the recent United States Supreme Court cases of *United States* v. *Robinson* (1973) 414 U.S. 218 [38 L.Ed.2d 427, 94 S.Ct. 467], and *Gustafson* v. *Florida* (1973) 414 U.S. 260 [38 L.Ed.2d 456, 94 S.Ct. 488], "should be dispositive of any question regarding the permissible scope of the search herein." ■ We disagree. Whether or not the instant case is distinguishable from *Robinson-Gustafson,* as defendant claims, we note that those cases were decided under the Supreme Court's view of the *minimum* standards required in order to satisfy the Fourth Amendment's proscription of unreasonable searches. Our holding today is based exclusively on article I, section 13, of the California Constitution, which requires a more exacting standard for cases arising within this state.

A

In *Robinson* the defendant was arrested for driving a motor vehicle after his license had been revoked. A full field search was made and contraband was found in a crumpled cigarette package in his pocket.[13] Although Robinson's right to post bond at the station cannot be determined from the Supreme Court opinion, the Court of Appeals had noted that "he was clearly entitled to post either cash or bail bond and, upon doing so, to be released immediately, without any stationhouse confinement or incident search of his person." (*United States* v. *Robinson* (1972) 471 F.2d 1082, 1102-1103 [153 App.D.C. 114].)[14]

If such an arrest had occurred in California the officer would have been limited to a pat-down prior to transporting the defendant in the patrol vehicle. (Veh. Code, § 40303, subd. (h).) As discussed exhaustively in *Simon* and hereinabove, the only possible rationale for any search in such circumstances would be the self-protective need of the officer to determine if the arrestee were armed. There can be neither "instrumentalities" nor "fruits" of the offense of driving after revocation of an operator's license. Similarly, a search of the cigarette package could not be justified on the theory that it might possibly contain an atypical weapon, unless the officer were able to articulate facts supporting such a belief.

However, the court in *Robinson* remained unmoved by these consider-

[13]In *Gustafson* the facts were similar in that the defendant was arrested for failure to have his operator's license in his possession. A full field search of the person was made and marijuana cigarettes were found inside an ordinary cigarette box located in the defendant's pocket. The Supreme Court upheld the search on the same basis as *Robinson*. For the purposes of our discussion there do not appear to be significant distinctions between the two cases, and accordingly references to *Robinson* should be taken to apply to *Gustafson* also.

[14]The factual uncertainty in the Supreme Court opinion makes it extremely difficult to ascertain the parameters of the key phrase "custodial arrest." Although the court repeatedly utilizes this term, it nowhere defines it. In a footnote (fn. 2, p. 221 of 414 U.S. [38 L.Ed.2d p. 433]) the court quotes the testimony of a patrolman who defined "full custody arrest" as one in which an officer "would arrest a subject and subsequently transport him to a police facility for booking," but the opinion fails to indicate whether the latter requirement is a necessary concomitant of the term. Similarly, there is no mention of whether Robinson himself was to be booked. The offense is described as carrying a "mandatory minimum jail term, a mandatory minimum fine, or both." (*Id.,* at p. 220 [38 L.Ed.2d at p. 432].) As noted above, the only reference to Robinson's ability to post bond and avoid the process of booking and incarceration appears in the opinion of the Court of Appeals. Thus we assume that what is meant is that Robinson could ultimately have been either jailed or fined or both, but in any event the option to avoid the booking process by posting bond remained open to him.

ations and held that "The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." (414 U.S. at p. 235 [38 L.Ed.2d at pp. 440-441].)

In the present case we have analogized the need to search Brisendine's knapsack to the search of a traffic arrestee who is to be transported before a magistrate and given the opportunity to post bond. In both circumstances we have recognized the legitimate concern of the officer in insuring that the suspect is unarmed. In neither instance would we allow intrusion into effects which could not possibly contain weapons, absent a showing of reasonable suspicion of the presence of an atypical weapon. The Supreme Court has taken like facts and reached a contrary result. In choosing between these irreconcilable rules we cannot accept the *Robinson* implication that "an individual lawfully subjected to a custodial arrest retains no significant Fourth Amendment interest in the privacy of his person." (414 U.S. at p. 237 [38 L.Ed.2d at p. 441]; Powell, J. concurring.) Whatever may be the merit of that view when an individual is ultimately to be booked and incarcerated—a question not presented here—we find it inappropriate in the context of an arrestee who will never be subjected to that process.[15]

---

[15]An extended analysis of the reasons underlying our belief that a traffic arrestee retains a significant interest in the integrity of his person and vehicle appears in *Simon* and *Kiefer*. We see no need to repeat that discussion here except to note where it differs from the approach of *Robinson*. That opinion proceeds from the premise that "It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment." (414 U.S. at p. 224 [38 L.Ed.2d at p. 434].) It then recites that "The justification or reason for the authority to search . . . rests quite as much on the need to disarm the suspect in order to take him into custody as it does on the need to preserve evidence . . . ." (*Id.*, at p. 234 [38 L.Ed.2d at pp. 439-440].) While based upon this need, however, "The authority to search . . . does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect." Thus "[H]aving in the course of a lawful search come upon the crumpled package of cigarettes, [the officer] was entitled to inspect it . . . ." (*Id.*, at p. 236 [38 L.Ed.2d at p. 441].)

We have no quarrel with the proposition that a search incident to an arrest is a

B

There remains for consideration whether we should adhere to our precedential decisions on this point even though they impose a higher standard than is now required by *Robinson*. Our right to do so cannot be seriously questioned. In *Cooper* v. *California* (1967) 386 U.S. 58, 62 [17 L.Ed.2d 730, 734, 87 S.Ct. 788], the Supreme Court recognized this well-known principle: "Our holding, of course, does not affect the State's power to impose higher standards on searches and seizures than required by the Federal Constitution if it chooses to do so." Moreover, "[e]ven though a state court's opinion relies on similar provisions in both the State and Federal Constitutions, the state constitutional provision has been held to provide an independent and adequate ground of decision depriving this Court of jurisdiction to review the state judgment." (*Jankovich* v. *Indiana Toll Road Comm'n* (1965) 379 U.S. 487, 491-492 [13 L.Ed.2d 439, 443, 85 S.Ct. 493].)[16]  ▉  In short, the Supreme Court has clearly recognized that state courts are the ultimate arbiters of state law, even textually parallel provisions of state constitutions, unless such interpretations purport to restrict the liberties guaranteed the entire citizenry under the federal charter.

This court has always assumed the independent vitality of our state Constitution. In the search and seizure area our decisions have often comported with federal law, yet there has never been any question that this similarity was a matter of choice and not compulsion. As Chief Justice Wright stated in *People* v. *Triggs* (1973) 8 Cal.3d 884, 892, footnote 5 [106 Cal.Rptr. 408, 506 P.2d 232]: "At least since the advent of *Wolf* v. *Colorado* (1949) 338 U.S. 25 [93 L.Ed. 1782, 69 S.Ct. 1359], we have treated the law under article I, section 19 [now § 13], of our state Constitution as 'substantially equivalent' to the Supreme Court's con-

traditional exception to the necessity to obtain a warrant, nor with the concept that a portion of its justification is the need to uncover weapons. We also accept the view that transportation in a police vehicle per se justifies a limited weapons search, regardless of the likelihood that a particular arrestee is armed. However, we have examined the *Robinson* opinion at length and remain unable to determine how the final conclusion flows from these premises. Rather, the converse would seem to be true: having in the course of a lawful *weapons* search come upon a crumpled cigarette package, the officer would have no reasonable ground to inspect it. Our decisions have invariably required articulable grounds to inspect, and we decline the invitation of the People to abrogate that long-established principle today.

[16]For examples of the operation of this rule in California, see *Rios* v. *Cozens* (1973) 9 Cal.3d 454 [107 Cal.Rptr. 784, 509 P.2d 696] (due process); *People* v. *Krivda* (1973) 8 Cal.3d 623 [105 Cal.Rptr. 521, 504 P.2d 457] (search and seizure); *Dept. of Mental Hygiene* v. *Kirchner* (1965) 62 Cal.2d 586 [43 Cal.Rptr. 329, 400 P.2d 321, 20 A.L.R.3d 361] (equal protection).

struction of the Fourth Amendment. (See *Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 270-271, fn. 6 [96 Cal.Rptr. 42, 486 P.2d 1242, 47 A.L.R.3d 1206].) On at least one occasion, however, we have expressly departed from the federal rule to afford defendants a broader security against unreasonable searches and seizures than that required by the Supreme Court. (See *People* v. *Martin* (1955) 45 Cal.2d 755, 759-761 [290 P.2d 855] [vicarious exclusionary rule].) ▆▆▆ In interpreting our state Constitution, we of course retain the 'power to impose higher standards on searches and seizures than required by the Federal Constitution.' (*Cooper* v. *California* (1967) 386 U.S. 58, 62 [17 L.Ed.2d 730, 734, 87 S.Ct. 788].)" (See generally Falk, *The State Constitution: A More Than "Adequate" Nonfederal Ground* (1973) 61 Cal.L.Rev. 273.)

In *Martin*, this court interpreted the exclusionary rule adopted in *People* v. *Cahan* (1955) *supra*, 44 Cal.2d 434, to apply vicariously. *Cahan* itself was decided six years before the exclusionary rule was made binding on the states in *Mapp* v. *Ohio* (1961) 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R.2d 933]. Our vicarious exclusionary rule has never been required under the Fourth Amendment (see *Alderman* v. *United States* (1969) 394 U.S. 165, 171-176 [22 L.Ed.2d 176, 185-188, 89 S.Ct. 961]) but has been a continuing feature of California law under our ability to impose higher standards for searches and seizures than compelled by the federal Constitution. (*Kaplan* v. *Superior Court* (1971) 6 Cal.3d 150, 155 [98 Cal.Rptr. 649, 491 P.2d 1].)[17]

▆▆▆ The foregoing cases illustrate the incontrovertible conclusion that the California Constitution is, and always has been, a document of

---

[17]A similar development has taken place in the law of double jeopardy. In *Gori* v. *United States* (1961) 367 U.S. 364, 369 [6 L.Ed.2d 901, 905, 81 S.Ct. 1523], the United States Supreme Court held that a defendant may be retried without violating the double jeopardy clause of the Fifth Amendment to the United States Constitution if the court grants a mistrial without the defendant's consent but in his "interest." In *Cardenas* v. *Superior Court* (1961) 56 Cal.2d 273, 275-276 [14 Cal.Rptr. 657, 363 P.2d 889, 100 A.L.R.2d 371], we declined to apply that rule in a California prosecution because it "does not accord with the uniform construction placed by this court upon the jeopardy provision of the California Constitution . . . [now art. I, § 15]." In *Benton* v. *Maryland* (1969) 395 U.S. 784, 794 [23 L.Ed.2d 707, 715, 89 S.Ct. 2056], the United States Supreme Court held that the Fifth Amendment to the federal Constitution was applicable to the states through the Fourteenth Amendment. Nevertheless, when the issue was again presented to us we adhered "to our decision in *Cardenas* not to adopt the *Gori* rule in applying the double jeopardy provision of the California Constitution. *Benton* requires only that the states accord their citizens at least as much protection against double jeopardy as is provided under the Fifth Amendment of the United States Constitution; it does not forbid a state from according a *greater* degree of such protection." (Fn. omitted.) (*Curry* v. *Superior Court* (1970) 2 Cal.3d 707, 716 [87 Cal.Rptr. 361, 470 P.2d 345].)

independent force. Any other result would contradict not only the most fundamental principles of federalism but also the historic bases of state charters. It is a fiction too long accepted that provisions in state constitutions textually identical to the Bill of Rights were intended to mirror their federal counterpart. The lesson of history is otherwise: the Bill of Rights was based upon the corresponding provisions of the first state constitutions, rather than the reverse. "By the end of the Revolutionary period, the concept of a Bill of Rights had been fully developed in the American system. Eleven of the 13 states (and Vermont as well) had enacted Constitutions to fill in the political gap caused by the overthrow of British authority. . . .[¶] . . . Eight of the Revolutionary Constitutions were prefaced by Bills of Rights, while four contained guarantees of many of the most important individual rights in the body of their texts. Included in these Revolutionary constitutional provisions were *all of the rights that were to be protected in the federal Bill of Rights.* By the time of the Treaty of Paris (1783) then, the American inventory of individual rights had been virtually completed and included in the different state Constitutions whether in separate Bills of Rights or the organic texts themselves." (Italics added.) (1 Schwartz, The Bill of Rights: A Documentary History (1971) p. 383; see generally 2 *id.,* p. 1204.) In particular, the Rights of the Colonists (Boston, 1772) declared for the first time "the right against unreasonable searches and seizures that was to ripen into the Fourth Amendment" (1 *id.,* at pp. 199, 206), and that protection was embodied in every one of the eight state constitutions adopted prior to 1789 which contained a separate bill of rights (1 *id.,* at pp. 235, 265, 278, 282, 287, 323, 342, 377).[18]

We need not further extend this opinion to trace to their remote origins the historical roots of state constitutional provisions. Yet we have no doubt that such inquiry would confirm our view of the matter. The federal Constitution was designed to guard the states as sovereignties against potential abuses of centralized government; state charters, however, were conceived as the first and at one time the only line of protection of the individual against the excesses of local officials. Thus in

---

[18]It even appears that a number of these were more specific than the language of the future Fourth Amendment. Thus article XIV of the Massachusetts Declaration of Rights (1780) declared that "Every subject has a right to be secure from all unreasonable searches, and seizures of his person, his houses, his papers, and all his possessions. All warrants, therefore, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation; and if the order in the warrant to a civil officer, to make search in suspected places, or to arrest one or more suspected persons, or to seize their property, be not accompanied with a special designation of the persons or objects of search, arrest, or seizure: and no warrant ought to be issued but in cases, and with the formalities, prescribed by the laws." (1 *id.,* at p. 342.)

determining that California citizens are entitled to greater protection under the California Constitution against unreasonable searches and seizures than that required by the United States Constitution, we are embarking on no revolutionary course. Rather we are simply reaffirming a basic principle of federalism—that the nation as a whole is composed of distinct geographical and political entities bound together by a fundamental federal law but nonetheless independently responsible for safeguarding the rights of their citizens.

The ultimate confirmation of our conclusion occurred, finally, when the people adopted article I, section 24, of the California Constitution at the November 1974 election, declaring that "Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution." Of course this declaration of constitutional independence did not originate at that recent election; indeed the voters were told the provision was a mere reaffirmation of existing law.[19]

Principles comparable to the foregoing were recently invoked by the Hawaii Supreme Court to invalidate under the Hawaii Constitution a search which would have been permissible under *Robinson. (State* v. *Kaluna* (1974) 55 Hawaii 361 [520 P.2d 51]; cf. also *People* v. *Copeland* (1974) 77 Misc.2d 649 [354 N.Y.S.2d 399], and *People* v. *Kelly* (1974) 77 Misc.2d 264 [353 N.Y.S.2d 111] [holding that a state may impose higher standards under the Fourth Amendment than required by *Robinson*].) The defendant in *Kaluna,* a woman, was arrested on suspicion of attempted robbery. At the police station she was searched by a matron preparatory to being placed in custody. The matron opened a small piece of folded tissue paper secreted in the defendant's brassiere and discovered four Seconal capsules.

For reasons similar to those we articulated in *Simon,* the court held that the search violated a provision of the Hawaii Constitution (art. I, § 5) essentially identical to the Fourth Amendment and article I, section 13, of our state charter. (520 P.2d at pp. 55-57.) The court then considered the impact of *Robinson* and *Gustafson,* but declined to adopt their rule on the ground that the state Constitution afforded a higher degree of protection to persons within its jurisdiction: "In our interpretation of the United States Constitution, of course, we are bound to follow applicable pronouncements by the United States Supreme Court. There is no doubt that the search conducted in this case was reasonable under

---

[19]Analysis by Legislative Analyst, Ballot Pamphlet, General Election (Nov. 5, 1974) page 26.

the fourth amendment as construed in *Robinson* and *Gustafson*. We have already indicated that the defendant's search at the police station was incident to her custodial arrest; assuming that arrest to be lawful, the search of her body and all personal effects in her possession did not violate her federal constitutional rights since 'the fact of [her] lawful arrest' [*Robinson*, at p. 235 of 414 U.S. (38 L.Ed.2d P. 440)] alone gave the police plenary authority to subject her to a detailed search.

"However, as the ultimate judicial tribunal in this state, this court has final, unreviewable authority to interpret and enforce the Hawaii Constitution. We have not hesitated in the past to extend the protections of the Hawaii Bill of Rights beyond those of textually parallel provisions in the Federal Bill of Rights when logic and a sound regard for the purposes of those protections have so warranted. *See* State v. Santiago, 53 Haw. 254, 265, 492 P.2d 657, 664 (1971). In our view, the right to be free of 'unreasonable' searches and seizures under article I, section 5 of the Hawaii Constitution is enforceable by a rule of reason which requires that governmental intrusions into the personal privacy of citizens of this State be no greater in intensity than absolutely necessary under the circumstances." (Fns. omitted.) (*Id.,* at pp. 58-59.) The court further explained that although its holding "results in a divergence of meaning between words which are the same in both the federal and state constitutions, the system of federalism envisaged by the United States Constitution tolerates such divergence where the result is *greater* protection of individual rights under state law than under federal law. [Citation.] In this respect, the opinion of the United States Supreme Court on the meaning of the phrase 'unreasonable searches and seizures' is merely another source of authority, admittedly to be afforded respectful consideration, but which we are free to accept or reject in establishing the outer limits of protection afforded by article I, section 5 of the Hawaii Constitution." (*Id.,* at p. 58, fn. 6.)

For all the foregoing reasons *Robinson* is not controlling here. Rather, we reaffirm and follow the decisions, exemplified by *Simon,* which impose a higher standard of reasonableness under article I, section 13, of the California Constitution.

The judgment (order granting probation) is reversed.

Wright, C. J., Tobriner, J., and Sullivan, J., concurred.

BURKE, J.*—The majority holds that the contraband was obtained by an unreasonable search and seizure in violation of article I, section 13, of our state Constitution—that the foregoing constitutional provision imposes a different standard of reasonableness than that enunciated by the United States Supreme Court under the Fourth Amendment of the federal Constitution (*United States* v. *Robinson,* 414 U.S. 218 [38 L.Ed.2d 427, 94 S.Ct. 467]; *Gustafson* v. *Florida,* 414 U.S. 260 [38 L.Ed.2d 456, 94 S.Ct. 488]), which amendment is essentially identical in language to article I, section 13, of our state Constitution. In my opinion those decisions by the United States Supreme Court are highly persuasive as to the standard of reasonableness imposed by article I, section 13, and should be followed. Under the reasoning of those cases, as we shall see, the instant search and seizure were reasonable.

*United States* v. *Robinson, supra,* 414 U.S. 218, concluded that the Fourth Amendment did not bar admission in evidence of heroin found in a crumpled cigarette package removed from the defendant's pocket by an officer during a field search following defendant's "lawful custodial arrest" for driving after his license was revoked. The United States Supreme Court stated that it was not "inclined, on the basis of what seems to us to be a rather speculative judgment, to qualify the breadth of the general authority to search incident to a lawful custodial arrest on an assumption that persons arrested for the offense of driving while their licenses have been revoked are less likely to possess dangerous weapons than are those arrested for other crimes." (*Id.,* at p. 234 [38 L.Ed.2d at p. 440].) The court pointed out that "The danger to the police officer flows from the fact of the arrest, and its attendant proximity, stress and uncertainty, and not from the grounds for arrest" (*id.,* at p. 234, fn. 5 [38 L.Ed.2d at p. 440]) and that "It is scarcely open to doubt that the danger to an officer is far greater in the case of the extended exposure which follows the taking of a suspect into custody and transporting him to the police station than in the case of the relatively fleeting contact resulting from the typical *Terry*-type stop. This is an adequate basis for treating all custodial arrests alike for purposes of search justification." (*Id.,* at pp. 234-235 [38 L.Ed.2d at p. 440].) It is clear from *Robinson* that the limitations placed by *Terry* v. *Ohio,* 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868], on protective searches conducted in an investigatory stop situation based on less than probable cause are not to be carried over to searches made incident to lawful custodial arrests.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

*Robinson* further declared, "The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." (414 U.S. at p. 235 [38 L.Ed.2d at pp. 440-441].)

*Gustafson* v. *Florida, supra,* 414 U.S. 260, followed the principles enunciated in *Robinson* and concluded that certain factual differences between the two cases were not determinative of the constitutional issue.

The United States Supreme Court did not define the term "custodial arrest" in either *Robinson* or *Gustafson*.[1] In *Robinson* it was conceded that the officer effected a "full custody arrest," and *Robinson* stated that, since the officer made such an arrest, it was unnecessary to reach the question of the law where the officer makes a " 'routine traffic stop,' *i.e.,* where the officer would simply issue a notice of violation and allow the offender to proceed." (414 U.S. at p. 236, fn. 6 [38 L.Ed.2d at p. 441].) The foregoing statement indicates that something more than stopping a traffic violator and issuing him a citation is required in order to have a "custodial arrest." In *Gustafson* the officer placed the defendant "under arrest for failure to have his vehicle operator's license in his possession" and "took [him] into custody in order to transport him to the station-house for further inquiry" (414 U.S. at p. 262 [38 L.Ed.2d at p. 459]). In neither *Robinson* nor *Gustafson* does it appear that the arrest was·for a type of offense that would necessarily lead to the arrestee's incarceration.[2]

---

[1] *Robinson* quoted the testimony of a patrolman who defined the term "full custody arrest" as "one where an officer 'would arrest a subject and subsequently transport him to a police facility for booking' " (414 U.S. at p. 221, fn. 2 [38 L.Ed.2d at p. 433]), but *Robinson* did not indicate that it adopted the foregoing definition or that the term "custodial arrest" had only the foregoing meaning.

[2] In *Robinson* police regulations provided that in the case of certain offenses including the offense there in question the officer "shall make a summary arrest of the violator and take the violator, in custody, to the station house for booking." (414 U.S. at p. 223, fn. 2 [38 L.Ed.2d at p. 433].) The *Robinson* majority did not dispute statements in the dissent

Before *Robinson* and *Gustafson* this court held in *People* v. *Superior Court (Simon)* 7 Cal.3d 186, 208-211 [101 Cal.Rptr. 837, 496 P.2d 1205], that a full body search of a person arrested for an ordinary traffic violation could not be justified as an incident to the officer's decision to take him into custody for transportation before a magistrate. *Robinson* and *Gustafson* are contrary to *Simon,* as the majority recognizes. The majority seeks to avoid the impact of those United States Supreme Court decisions by now declaring that *Simon,* which mentions only the Fourth Amendment of the federal Constitution, was in fact based on our state constitutional provision against unreasonable searches and seizures. Even if it be assumed that *Simon* was so based, it does not follow that we should continue to interpret that state constitutional provision, which is essentially identical in language to the Fourth Amendment,[3] in a manner different from the United States Supreme Court's interpretation of the Fourth Amendment.

Decisions of the United States Supreme Court as to the meaning of language in a federal constitutional provision are strongly persuasive as to what interpretation should be placed upon similar language in a state Constitution (see, e.g., *Cohen* v. *Superior Court,* 173 Cal.App.2d 61, 67 [343 P.2d 286]; *Pickett* v. *Matthews,* 238 Ala. 542 [192 So. 261, 265-266]; *City of Portland* v. *Thornton,* 174 Ore. 508 [149 P.2d 972, 973]), and are generally followed (see, e.g., *People* v. *Jackson,* 22 Ill.2d 382 [176 N.E.2d 803, 805]; *Sperry & Hutchinson Co.* v. *State,* 188 Ind. 173 [122 N.E. 584, 587]; *City of Tacoma* v. *Heator,* 67 Wn.2d 733 [409 P.2d 867, 869]; 21 C.J.S., Courts, § 205, p. 363). To have two sets of rules under essentially identical constitutional provisions would create confusion. (See Blubaugh, *A Philosophical Struggle Within The Supreme Court,* (Nov. 1974) Cal.J. 382, 383-384 [view of Wright, C. J.].)

*Robinson* and *Gustafson* manifestly afford greater protection to law enforcement officers than do *Simon* and the instant majority opinion.[4]

---

indicating that a person transported to the station house for booking quite possibly may never be placed in jail—that in the jurisdiction there involved the offense in question was bailable and "the normal procedure is for offenders to be advised of the opportunity to post collateral at the station house and to avoid an inventory search unless they are unable or refuse to do so" (*id.,* at p. 258, fn. 7 [38 L.Ed.2d at p. 454]).

[3]Article 1, section 13 (formerly art. 1, § 19) of our state Constitution was based on a substantially identical provision in the 1849 California Constitution (art. 1, § 19). One of the delegates to the 1849 constitutional convention commented that article 1, section 19 "was word for word from the Constitution of the United States, 4th article." (See Browne, Report of the Debates in the Convention of California (1849).)

[4]For example, under *Robinson* and *Gustafson* an officer may make a full search of a person who is placed under custodial arrest, whereas under neither *Simon* nor the instant

But, states the majority, "we cannot accept the *Robinson* implication that 'an individual lawfully subjected to a custodial arrest retains no significant Fourth Amendment interest in the privacy of his person.' (414 U.S. at p. 237 [38 L.Ed.2d at p. 441]; Powell, J. concurring.)" That implication, however, appears to have been expressly or impliedly accepted by six justices of the highest court in this land. The majority herein points to no condition peculiar to California warranting a different view in this state.

The majority notes that our state Constitution declares that "Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution." (Cal. Const., art. I, § 24.) That declaration, however, does not mean that provisions of our state Constitution should be given a different interpretation than that given by the United States Supreme Court to essentially identical provisions of the federal Constitution.

Two states, the majority notes, have declined to follow *Robinson* and *Gustafson*. A number of other states, however, have followed those decisions. (*Sizemore* v. *State* (Ind.App.) 308 N.E.2d 400, 406; *State* v. *Cromwell* (Mo.App.) 509 S.W.2d 144, 146; *Hughes* v. *State* (Okla.Crim.) 522 P.2d 1331, 1333; see *State* v. *Mabra,* 61 Wis.2d 613 [213 N.W.2d 545, 550-551].) *Hughes* stated that the provisions of the Oklahoma Constitution relating to search and seizure and the Fourth Amendment are identical, that therefore in determining the legality of the search and seizure there in question the court must look to decisions of the United States Supreme Court interpreting the Fourth Amendment, and that under the reasoning of *Robinson* and *Gustafson* the search and seizure did not violate the state Constitution.

majority opinion can an officer investigate the contents of a cigarette box or bottle that is in the pocket of such a person unless the officer is able to point to specific facts that support a belief that the arrestee is armed with an atypical weapon (e.g., razor blades or acid), and officers undoubtedly often will have no knowledge of facts indicating one way or the other on that subject. Also, according to the majority, if a full custody arrest had been made in California for the offense involved in *Robinson* the "Officer would have been limited to a pat-down prior to transporting the defendant in the patrol vehicle." A pat-down, however, might not reveal a carefully concealed weapon (e.g., a knife blade secreted in a belt or under the arch preserver in a shoe). (See generally, LaFave, *"Street Encounters and the Constitution"* 67 Mich.L.Rev. 40, 91 [noting that the search of a person who is arrested and is to be transported to the station (often unwatched in the rear of a police vehicle) must be more extensive than in the *Terry* v. *Ohio, supra,* 392 U.S. 1, situation because the arrestee may well have an opportunity to get his hands on a carefully concealed weapon, whereas in the *Terry* situation the need is only to find implements that could readily be grasped by the suspect during brief face-to-face encounter].)

Although in interpreting our state Constitution we may not be bound by *Robinson* and *Gustafson,* those decisions are highly indicative that the above stated holding in *Simon* was not required by the considerations underlying the exclusionary rule. I would follow *Robinson* and *Gustafson* and overrule *Simon* and other California cases in accord with *Simon* insofar as they are contrary to *Robinson* and *Gustafson.*[5]

I turn next to whether this case differs in any significant respect from *Robinson* and *Gustafson.* Defendant seeks to distinguish this case from those decisions on the ground that, assertedly, there was no "lawful custody arrest" here. I do not agree that there was not such a custodial arrest in this case. The record shows that defendant and his three companions were arrested for camping in a prohibited area and having an open campfire in violation of a county ordinance and that they were to be escorted by the two officers three-quarters of a mile over rough terrain to the patrol car since camping was prohibited in the area and the officers' citation books were in the patrol car. In my opinion the arrests constituted custodial arrests. Here, as in *Gustafson* and *Robinson,* there was extended exposure of the officers to danger rather than the "relatively fleeting contact resulting from the typical *Terry*-type stop" (see *United States* v. *Robinson, supra,* 414 U.S. 218, 235 [38 L.Ed.2d 427, 440]). And the arrests were lawful. Although defendant asserts that the officers lacked "probable cause to arrest," he does not elaborate on that assertion, and, since he concedes in his brief that the campfire was "illegal" and since the officers observed him and his companions in sleeping bags by the campfire, it is apparent that they had probable cause for the arrests for an illegal campfire. Probable cause exists "when the facts and circumstances within the knowledge of the officers at the moment of the arrest are sufficient to warrant a prudent man in believing that the defendant has committed an offense." (*Beck* v. *Ohio,* 379 U.S. 89, 96 [13 L.Ed.2d 142, 147-148, 85 S.Ct. 223]; *People* v. *Talley,* 65 Cal.2d 830, 835 [56 Cal.Rptr. 492, 423 P.2d 564].) Moreover, there was also probable cause for the arrests for illegal camping.

---

[5]Since both *Robinson* and *Gustafson* indicate that it has been "established Fourth Amendment law" since the decision in *Weeks* v. *United States,* 232 U.S. 383 [58 L.Ed. 652, 34 S.Ct. 341], that the arresting officer may conduct "a full search" of the person of the arrestee incident to "a lawful custodial arrest" (414 U.S. 218, 224 et seq. [38 L.Ed.2d 427, 434 et seq.]; 414 U.S. 260, 264 [38 L.Ed.2d 456, 460]), those decisions did not change the law but merely clarified and restated pre-existing constitutional rules. It follows that *Robinson* and *Gustafson* are not solely prospective. (Cf. *People* v. *Miller,* 7 Cal.3d 219, 223 [101 Cal.Rptr. 860, 496 P.2d 1228]; *Gallik* v. *Superior Court,* 5 Cal.3d 855, 859-860 [97 Cal.Rptr. 693, 489 P.2d 573]; *Roumbanis* v. *Superior Court,* 29 Cal.App.3d 542, 546-547 [105 Cal.Rptr. 702].)

Defendant next points to the fact that both *Robinson* and *Gustafson* involved a search of a *person* whereas here we are concerned with a search of a *knapsack.* However, the two officers could not reasonably be expected to act as porters for the knapsack and other camping gear of the four arrestees, and, as the majority recognizes, the officers were well within their authority in insuring that the arrestees' violations cease and this included, inter alia, the removal of the knapsack and other camping gear. Under the circumstances the knapsack amounted to "an extension of [the] person[s]" of the arrestees and was subject to a search. (*People* v. *Belvin,* 275 Cal.App.2d 955, 958-959 [80 Cal.Rptr. 382].) It is immaterial that the knapsack was not on the immediate person of any arrestee at the moment of the arrests. (*People* v. *Belvin, supra.)*

Having in the course of a lawful search of the knapsack come across the bottle and envelopes, the officer was entitled to inspect them (cf. *United States* v. *Robinson, supra,* 414 U.S. 218, 236 [38 L.Ed.2d 427, 441]; *Gustafson* v. *Florida, supra,* 414 U.S. 260, 266 [38 L.Ed.2d 456, 461]), and when that inspection revealed contraband he was entitled to seize it (*United States* v. *Robinson, supra; Gustafson* v. *Florida, supra).* In my opinion under the reasoning of *Robinson* and *Gustafson* the search and seizure were reasonable[6] and the superior court properly denied the motion to suppress. I would affirm the order granting probation.

McComb, J., and Clark, J., concurred.

---

[6]In this case, as in *Robinson* and *Gustafson,* it does not appear that the arrests were a mere pretext to search (see *People* v. *Haven,* 59 Cal.2d 713, 719 [31 Cal.Rptr. 47, 381 P.2d 927]), and the search partook of none of the extreme or patently abusive characteristics that were held to violate due process in *Rochin* v. *California,* 342 U.S. 165 [96 L.Ed. 183, 72 S.Ct. 205, 25 A.L.R.2d 1396].