APPELLATE DIVISION

RAMON P. SIRILAN, et al., ) DCA NO. 83-9009
 )
 Plaintiffs-Appellants, ) CTC NO. 82-139
 )
 vs. )
 ) OPINION
FRANCISCO C. CASTRO, )
 )
 Defendant-Appellee. )
_____)

Attorney for Appellants: Reynaldo O. Yana
 P. O. Box 52
 Saipan, CM 96950

Attorney for Appellee: William S. Mount
 Assistant Attorney General
 Office of the Attorney General
 5th Floor, Nauru Building
 Saipan, CM 96950

BEFORE: Judges LAURETA and KEEP, District Judges and SOLL,*
 Designated Judge

SOLL, Designated Judge:

 Plaintiffs-appellants seek review of the trial court's

denial of their summary judgment motion and also of the subse-

quent grant of summary judgment in favor of defendant-appellee.

_____

*Honorable Herbert D. Soll, Commonwealth Trial Court Associate
 Judge sitting by designation pursuant to 48 U.S.C. § 1694b.

1085

Appellants assert that the trial court erred in its failure to recognize their vested rights to enhanced immigration status under the laws of the Commonwealth. Additionally, appellants contend that the trial court misinterpreted principles of due process and equal protection as they apply to the immigration and naturalization laws. We are persuaded by appellants' equal protection arguments and reverse.

### I.

The government of the Northern Mariana Islands exercises authority over local immigration pursuant to Section 503(a)[1]/of the Covenant.[2]/ On April 1, 1977, Public Law (P.L.) 1-5 was passed by the Northern Mariana Islands Legislature,[3]/ the purpose of which was to establish a "permanent residency" status under the immigration laws in effect in the Northern Mariana Islands. Section 1 provided the Resident Commissioner[4]/with the authority to grant permanent residency status to persons who were not Trust Territory citizens, were of good moral character and

------------

[1]/Section 503 provides:

The following laws of the United States, presently inapplicable to the Trust Territory of the Pacific Islands, will not apply to the Northern Mariana Islands except in the manner and to the extent made applicable to them by the Congress by law after termination of the Trusteeship Agreement:

(a) ... the immigration and naturalization laws of the United States[.]

had resided in the Northern Mariana Islands for at least five years.[5] Regulations were established by the Resident Commissioner to carry out the provisions of the law.

On April 23, 1981, the Commonwealth Legislature passed P.L. 2-17 which repealed P.L. 5-11. Governor Camacho signed the

- - - - - - - - - -

[2]"Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America", 90 Stat. 263, reprinted in 48 U.S.C.A. § 1681 note.

[3]The Northern Mariana Islands Legislature was the body vested with legislative authority prior to the adoption of the Commonwealth Constitution and was bound by the provisions of the Covenant. Secretarial Order 2989, reprinted in 1 Trust Territory Code 36-44 (1980 ed.).

[4]The Resident Commissioner exercised executive authority in the Northern Mariana Islands pursuant to Secretarial Order No. 2989, supra note 3.

[5]Public Law 5-11, reprinted in 3 CMC § 4203 comment, provides:

Section 1. The Resident Commissioner may grant permanent residency status to persons who:

(1) are not citizens of the Trust Territory of the Pacific Islands; and

(2) are of good moral character, as certified by the Mayor of the Municipality in which such persons have resided, provided, however, that persons under the age of 16 are presumed to be of good moral character, unless otherwise demonstrated; and provided further, that no person convicted of a felony or crime of moral turpitude shall be deemed to be of good moral character unless such person shall have received a full pardon and had his civil rights restored; and

(3) have been actual residents of the Northern Mariana Islands for at least five (5) years immediately prior to application for permanent residence status.

legislation the same day giving it immediate effect. On April 24, 1981, the Commonwealth Immigration and Naturalization Office (INO) refused to accept applications for permanent residency.

By his amended complaint, Sirilan[6] alleged that he met all the requirements for permanent resident status on April 23, 1981 and challenged the refusal of the INO to process his application. He sought declaratory relief to the effect that P.L. 5-11 created in him an irrevocable right to the enhanced status. Alternatively, he complained that P.L. 2-17 violated constitutional guarantees of due process and equal protection.

On April 11, 1983, the trial court denied Sirilan's motion for summary judgment. In rejecting Sirilan's argument that he had a vested right to have his application processed, the court found that as such action was discretionary and not ministerial, any rights under the law did not vest. Also, following decisions of United States courts, the court found that the rule that statutes which grant privileges do not create entitlements applied a fortiori to immigration laws. The court also rejected Sirilan's due process arguments. Reading Sirilan's complaint to allege deprivations of procedural due process, the court concluded that Sirilan had no constitutional right to notice and an opportunity to be heard where his interests had

– – – – – – – – –

[6] The plaintiffs-appellants number twelve. However, for purposes of convenience and clarity, we refer only to Sirilan in this opinion.

been affected only by general legislation. Lastly, in addressing Sirilan's equal protection contentions, the court rejected the strict scrutiny and rational basis standards of review and upheld the statute under a standard whereby legislation survives challenge so long as it is not "wholly irrational."

On May 9, 1983, the court granted the Commonwealth's motion for summary judgment for the reasons set forth in its April 11, 1983 order.

## II.

Sirilan raises three issues in this appeal:

1. Whether P.L. 5-11 created in him a vested right to be granted permanent residency status;

2. Whether P.L. 2-17 violates principles of due process; and

3. Whether P.L. 2-17 transcends guaranties of equal protection.

## III.

Sirilan contends that upon meeting the conditions for permanent residency status set forth in P.L. 5-11, he acquired a "vested right" to that status which subsequent legislation could not divest. The Commonwealth contests these assertions on two grounds. First, it argues that the expectation of a desired immigration status is not an enforceable legal right. Second, in the alternative, Sirilan does not qualify as he has not met the procedural requirements.

Sirilan's argument is not convincing. Under the decisions of the United States Supreme Court, it is clearly established that a person has no vested interest in any rule of common law. Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 88 n.32, 98 S.Ct. 2620, 2638 n.32, 57 L.Ed.2d 595, 620 n.32 (1978). Legislation readjusting rights and burdens "is not unlawful solely because it upsets otherwise settled expectations." Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 16, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752, 767 (1976). "So long as the Constitution authorizes the subsequently enacted legislation, the fact that its provisions limit or interfere with previously acquired rights does not condemn it." Fleming v. Rhodes, 331 U.S. 100, 107, 67 S.Ct. 1140, 1144, 91 L.Ed. 1368, 1373, (1947). See also, e.g., Comtronics, Inc. v. Puerto Rico Telephone Co., 409 F.Supp. 800 (D.P.R. 1975)(a vested interest in existing conditions cannot be asserted against a proper exercise of police power) aff'd, 553 F.2d 701 (1st Cir. 1977).

The general principles regarding the ability of the government to modify expected statutory entitlements have been specifically found applicable in the immigration setting. In Talanoa v. Immigration and Naturalization Service, 397 F.2d 196 (9th Cir. 1968), the Ninth Circuit directly addressed the issue. Talanoa argued that as he qualified for a labor certification under the law at the time of his application, it was an abuse of discretion for the Immigration and Naturalization Service to deny the certification under an amendment made after the application

1090

was filed. In rejecting this contention, the panel held that "[i]t is settled that when the law is changed before a decision is handed down by an administrative agency, the agency must apply the new law." Id. at 200. Two years ago in Artukovic v. Immigration and Naturalization Service, 693 F.2d 894 (9th Cir. 1982), the Ninth Circuit reaffirmed its position. Artukovic had entered the United States in 1948 under an assumed name on a visitor's visa. When he overstayed his visa and it was discovered that he had entered under a false identity he was ordered deported by the Immigration and Naturalization Service. However, the order was stayed by the Regional Commissioner of the Service on the ground that Artukovic, an alleged Nazi war criminal, would be persecuted on return to Yugoslavia. In 1978, Congress amended the Immigration Act to deny stays to members of the Nazi installed governments. When the Board of Immigration Appeals reconsidered and revoked the stay under the new law, Artukovic filed the legal challenge. He argued that because of a savings clause in the 1952 Act which provided that all proceedings started before 1952 would be governed by the 1917 Act, the 1978 amendment was inapplicable to him. The Ninth Circuit did not hesitate in rejecting the argument. The cited provision, the panel held, "is merely a 'savings clause' to insure that the 1917 Act would continue to apply to cases pending in 1952.... It does not bar Congress from passing legislation that affects the status of anyone whose immigration proceedings began before 1952." Id. at 896-7. Thus, we believe that the trial court was correct in

its conclusion that P.L. 5-11 created in Sirilan no rights which could not be modified or revoked by proper legislative action. We turn now to the issue of whether the passage of .P.L. 2-17 was properly within the scope of legislative authority.

## IV.

Sirilan challenges P.L. 2-17 on the basis that it violates the constitutional guaranties of due process. The trial court, interpreting Sirilan's argument to allege transgressions of procedural due process, rejected the proffered position concluding that a person is not entitled to notice and a hearing before the passage of general legislation. Upon review of the pleadings and briefs, we find that Sirilan also raises a substantive due process claim.

The doctrine of substantive due process developed principally in the field of socio-economic regulation. See generally L.Tribe, American Constitutional Law 427-455 (1978). A leading case defining the parameters of the current model is Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934):

> The Fifth Amendment, in the field of federal activity, [footnote omitted] and the Fourteenth, as respects state action, [footnote omitted] do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty

> of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained.

54 S.Ct. at 510-511. Nebbia is still cited as controlling authority on substantive due process. See, e.g., Pruneyard Shopping Center v. Robins, 447 U.S. 74, 85, 100 S.Ct. 2035, 2042, 64 L.Ed.2d 741, 754 (1980). Although the facts of Nebbia involved economic regulation, the language was not so circumscribed. Indeed, decisions of the Supreme Court prior to Nebbia had found that the limits of the Fifth Amendment apply to all powers of Congress, including the war power. See, e.g., Hamilton v. Kentucky Distilleries & Warehouse Co., 251 U.S. 146, 156, 40 S.Ct. 106, 108, 64 L.Ed. 194, 199 (1919).

In Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed. 2d 989 (1961), Justice Harlan discussed the substantive aspects of due process:

> Were due process merely a procedural safeguard it would fail to reach those situations where the deprivation of life, liberty or property was accomplished by legislation which by operating in the future could, given even the fairest possible procedure in application to individuals, nevertheless destroy the enjoyment of all three. [Citations omitted]. Thus, the guaranties of due process... have in this country "become bulwarks also against arbitrary legislation." Hurtado v. People of State of California, 110 U.S. 516, at page 532, 4 S.Ct. 111, at page 119, 28 L.Ed. 232.

81 S.Ct. at 1775-1776 (Harlan, J. dissenting). Justice Harlan concluded that the scope of liberty protected by due process "is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints." Id. at 1777 (emphasis added). This dissenting view was adopted by the majority in Moore v. City of East Cleveland, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977.). Writing for the Court, Justice Powell added:

> Substantive due process · has at times been a treacherous field for this Court. There are risks when the judicial branch gives enhanced protection to certain substantive liberties without the guidance of the more specific provisions of the Bill of Rights. As the history of the Lochner era demonstrates, there is reason for concern lest the only limits to such judicial intervention become the predilections of those who happen at the time to be Members of this Court. [Footnote omitted]. That history counsels caution and restraint. But it does not counsel abandonment, nor does it require what the city urges here: cutting off any protection of...rights at the first convenient, if arbitrary boundary....

97 S.Ct. at 1937 (emphasis in original). See also Century Arms, Inc. v. Kennedy, 323 F.Supp. 1002 (D.Vt. 1971)(Congressional legislation which prohibited importation of all surplus military firearms, effectively preventing plaintiff from importing firearms purchased under a license issued under the previous laws, did not deny plaintiff due process in that the legislation was not unreasonable, arbitrary or capricious), aff'd, 449 F.2d

1094

1306 (2nd Cir. 1971), cert.denied, 405 U.S. 1065, 92 S.Ct. 1494, 31 L.Ed.2d 794 (1972).

The Commonwealth argues that, notwitstanding Nebbia and like cases, the Supreme Court has developed a very limited review under the Due Process Clause of immigration legislation. We find ample authority to support this position. See, e.g., Harisiades v. Shaughnessy, 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1952); Boutilier v. I.N.S., 387 U.S. 118, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967). However, the Court's adherence to this line of decisions has not been without considerable reluctance. In Harisiades, the Court found that congressional legislation subjecting aliens to expulsion after long residence " bristles with severities", but felt the entrenched notions of the Nation's inherent power over aliens mandated that the Court "leave the law on the subject as [it] finds it." 72 S.Ct. at 518. Three years later, in Galvan v. Press, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed.2d 911 (1954), the Court again expressed similar reservations:

> In light of the expansion of the concept of substantive due process as a limitation upon all powers of Congress... much could be said for the view, were we writing on a clean state, that the Due Process Clause qualifies the scope of political discretion heretofore recognized as belonging to Congress in regulating the entry and deportation of aliens.

74 S.Ct. at 742. However, the Court, feeling conclusively bound by precedent, found that the "slate is not clean" and with considerable hesitation relied on earlier holdings to support its

conclusion that "the formulation of these policies is entrusted exclusively to Congress" such notion being "about as firmly imbedded in the legislative and judicial tissue of our body politic as any aspect of our government." 74 S.Ct. at 743.

Thus, in the words of one commentator, despite its "misgivings about the self-imposed limitation on its role in this area, the Court is unwilling to abandon the plenary power thesis." G. Rosberg, The Protection of Aliens from Discriminatory Treatment by the National Government, 1977 Sup.Ct.Rev. 275, 323 (1978).

We are not, however, faced with the "whole volume" of precedential decisions that forced the Galvan court to refuse the call to adopt a new standard of review regarding substantive due process challenges to immigration legislation. Rather, for the reasons we explore in detail in part V, we find that the power exercised by the Commonwealth over immigration is sufficiently distinguishable from the parallel authority exercised by the United States Congress. Thus, unlike the situation before the Galvan court, the "slate" before us is "clean," allowing us to adopt a standard that allows for substantive due process review of the Commonwealth's immigration powers.[7] We hold today that

– – – – – – – – –

[7] We do not see the adoption of a different standard as a radical departure from federal precedent as much as a long delayed doctrinal evolution in a field in which the Supreme Court has felt constrained to adhere to antiquidated notions of judicial review. As Professor Rosberg notes, the Court, at the time it

Commonwealth legislation regarding immigration matters will be subject to the same review to which other legislation would be subject under substantive due process standards. That is, the law will be scrutinized to ensure that it is not unreasonable, arbitrary or capricious, and that the means selected have a real and substantial relation to the object sought to be attained.

Under this standard, the challenged statute passes constitutional muster. Sirilan does not challenge the legislature's authority to regulate immigration. Rather he challenges the reasonableness of P.L. 2-17, supporting his assertion with extensive factual arguments regarding the wisdom of the policy decisions. In reviewing legislation under the due process clause, we will not second-guess policy choices or sit as a "super-legislature to weigh the wisdom of legislation". Day-Brite Lighting v. Missouri, 342 U.S. 421, 423, 72 S.Ct. 405, 407, 96 L.Ed. 469, 472 (1952). Our review is at an end when we find

- - - - - - - - - -

issued the Galvan decision, did not hesitate to wipe the slate clean in a number of other areas such as racial segregation and Fifth Amendment equal protection. G. Rosberg, supra p.12, at 324. Several lower federal courts have in recent years edged away from the narrow judicial review in this context. See, e.g., In Re 68 Filipino War Veterans, 406, F.Supp. 931 (N.D.Cal.1975)(discrimination against aliens by I.N.S. subject to strict scrutiny). Developments in the Law-Immigration Policy and the Rights of Aliens, 96 Harv.L.Rev. 1286, 1323, n.60 and accompanying text (1983)[hereinafter Note, Developments in the Law-Aliens]; Note, Constitutional Limits on Power to Exclude Aliens, 82 Colum.L.Rev. 957, 963 (1982)[hereafter Note, Constitutional Limits].

that the policy choices are supported by a reasonable basis on which the legislature actually relied.

Here, the Committee Report to P.L. 2-17 reveals that the Legislature found the continued acceptance of foreign nationals as permanent residents to be "politically... undesirable" and economically and socially unsound as it would burden public services, overly tax financial resources, and restrict opportunities for "further development and advancement of the local people." In addition the report stated the view of the legislators that it would be wise to rewrite the old statutes in order to "streamline" Commonwealth immigration policy. These rationales are reasonable and support the action taken. Although Sirilan advances attractive arguments regarding the wisdom of the policy choices, we must remember that it is not our role to strike down legislation because we may have acted differently faced with the same concerns. Under due process review, we only review the government's actions to ensure that it is not arbitrary or capricious. Sirilan does not persuasively argue that P.L. 2-17 is so unreasonable as to be arbitrary nor does he convince us that the reasons set forth in the legislative history are mere pretexts for unconstitutional action. Accordingly, we are of the opinion that P.L. 2-17 comports with due process.

///

///

///

///

## V.

Sirilan alleges that the provision of P.L. 2-17 which allows the INO to process applications already filed but which prohibits the acceptance of new applications for permanent residency status creates a classification among aliens which is arbitrary, capricious and violative of the principles of equal protection embodied in the Fourteenth Amendment to the United States Constitution.[8]

## A.

First, we believe it important to emphasize here the long held position of the United States Supreme Court that the protections of the Fourteenth Amendment are not limited to citizens, but act as guardians of all persons within a state's jurisdiction. In Yick Wo v. Hopkins, 118 U.S. 355, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), decided almost a century ago, and soon after the ratification of the Amendment, the Court said:

> The fourteenth amendment to the constitution is not confined to the protection of citizens. It says: "Nor shall any state deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race,

_____

[8] The Fourteenth Amendment applies to the Commonwealth as if the Commonwealth "were one of the several States" under § 501 of the Covenant.

1099

of color or of nationality... The questions we have to consider... therefore, are to be treated as involving the rights of every citizen... equally with those of the strangers and aliens who now invoke the jurisdiction of the court.

6 S.Ct. at 1070. As recently as the 1982 term, the Supreme Court reaffirmed this principle:

Whatever his status under the immigration laws, an alien is surely a "person" in any ordinary sense of that term. Aliens, even aliens whose presence in this country is unlawful, have long been recognized as "persons" guaranteed due process of the law by the Fifth and Fourteenth Amendments. [Citations omitted.] Indeed, we have clearly held that the Fifth Amendment protects aliens... from, invidious discrimination by the Federal Government. [Citation omitted.]

Plyler v. Doe, 457 U.S. 202, 210, 102 S.Ct. 2382, 2391, 72 L.Ed.2d 786, 795 (1982). See also Leng May Ma v. Barber, 357 U.S. 185, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958). Thus, the fact that Sirilan is not a citizen of the Commonwealth does not lessen his entitlement to the equal protection of the laws.

The major dispute between the parties here revolves around the proper standard of review under which this Court should analyze Sirilan's objections.[9]

---

[9] There is a good reason for this emphasis on the review standard. In the words of Professor Gunther, strict scrutiny 

1100

Since the Supreme Court has traditionally viewed the government's authority over the regulation of alien affairs as an inherent attribute of sovereignty, it has adopted a limited standard of review regarding equal protection challenges in this area. See G. Rosberg, supra p.12, at 275-277. While it is clear that a deferential approach has been followed, many lower federal courts, as well as the parties to this case, agree that a well-defined standard has not evolved. See, e.g., Adams v. Howerton, 673 F.2d 1036, 1042 (9th Cir. 1982)("The scope of this very limited judicial review has not been further defined"), cert. denied, 458 U.S. 1111, 102 S.Ct. 3494, 73 L.Ed.2d 1373 (1982). United States v. Barajas-Guillen, 632 F.2d 749, 752 (9th Cir. 1980)("the Supreme Court has never explicitly described the standard for reviewing immigration-law classifications among aliens"). See also Note, Aliens and the Federal Government: A Newer Equal Protection, 8 U.C. Davis L.Rev. 1, 2-3 (1975).

The Supreme Court has given some guidelines, however, as to the scope of this limited review. The exercise of the government's immigration authority deserves "special judicial deference" and is subject only to "narrow judicial review."

------------

review is "'strict' in theory and fatal in fact" whereas the more traditional review calls for "minimal scrutiny in theory and virtually none in fact." G. Gunther, The Supreme Court, 1971 Term-Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1, 8 (1972). In only one case did an explicit racial classification withstand strict scrutiny review (Korematsu v. United States). See Tribe, supra p. 8, at 1000 n.2.

Fiallo v. Bell, 430 U.S. 787, 792-3, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50, 56-7 (1977). The exercise of the power will be upheld on the basis of a "facially legitimate and bona fide" reason; the court "will neither look behind the exercise of that discretion, nor test it" by balancing its justification against other asserted interests. Kleindiehst v. Mandel, 408 U.S. 753, 770, 92 S.Ct. 2576, 2585, 33 L.Ed.2d 683, 696 (1972). On another occasion, the Court stated that classifications among aliens would be upheld under the narrow review standard unless "wholly irrational." Mathews v. Diaz, 426 U.S. 67, 83, 96 S.Ct. 1883, 1893, 48 L.Ed.2d 478, 492 (1976). In another opinion, the Court stated that if the immigration action in question was mandated by Congress or the President, "we might presume that any interest which might rationally be served by the rule did in fact give rise to its adoption." Hampton v. Mow Sun Wong, 96 S.Ct. at 1905. Congressional legislation in immigration affairs, it has been fairly concluded, is "outside the scope of all but the most limited judicial review." L. Tribe, supra p.8, at 281.

Sirilan urges us to utilize a different standard than the deferential review developed by the United States Supreme Court. First, he argues that under another line of cases, the Court has adopted a strict scrutiny standard when reviewing alien legislation. It is true that the Court in Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), subjected a state welfare classification based on citizenship to strict judicial scrutiny. The Court was of the opinion that aliens are

1102

"a prime example of 'a discrete and insular' minority... for whom heightened judicial solicitude is appropriate." 91 S.Ct. at 1852. However, that case is sufficiently distinguishable under federal court decisions from the facts now before us. The classification in Graham distinguished between citizens and aliens; the case before us involves a classification among aliens. The Ninth Circuit discussed the difference in Alvarez v. District Director of the U.S. Immigration and Naturalization Service, 539 F.2d 1220 (9th Cir. 1976), cert. denied, 430 U.S. 918, 97 S.Ct. 1334, 51 L.Ed.2d 597 (1977):

> Appellee's argument that alienage is a suspect classification which triggers strict scrutiny under the equal protection clause is simply incorrect. Strict scrutiny is required when aliens as a class are treated differently from citizens solely because of alienage. [Citations omitted.] It does not apply when classifications are made among aliens.

539 F.2d at 1224 n.3. Additionally, it must be remembered that state discrimination against aliens, as was the case in Graham, is subject to more searching scrutiny under federal decisions because states are preempted by federal authority from the regulation of immigration affairs. See C. Rosberg, supra p.12, at 293-294, whereas, "there may be overriding national interests which justify selective federal legislation that would be unacceptable for an individual State." Hampton v. Mow Sun Wong,

///

///

1103

96 S.Ct. at 1904.[10]/

Sirilan also attempts to justify the adoption in this case of a stricter review standard with the assertion that P.L. 2-17 deprives him of his fundamental freedom "to live in the Commonwealth without restriction and the right to earn a livelihood."[11]/ Sirilan is correct in his assertion that government action which "impinges on a fundamental right explicitly or implicitly secured by the Constitution is presumptively unconstitutional", Mobile v. Borden, 446 U.S. 55, 76, 100 S.Ct. 1490, 1504, 64 L.Ed.2d 47, 64 (1980), and must be "carefully and meticulously scrutinized", Reynolds v. Sims, 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506, 527 (1964). However, the right of an alien, even one who possesses permanent resident status, has not been held by the federal courts to be "the type of 'fundamental right' which would subject classification touching on it to strict judicial scrutiny." Francis v. Immigration and Naturalization Service, 532 F.2d 268, 272 (2nd Cir. 1976). See also Castillo-Felix v. Immigration and

— — — — — — — — —

[10]/ Sirilan argues that under § 501 of the Covenant, the Fourteenth Amendment applies to the Commonwealth "as if the Northern Mariana Islands were one of the several States"; accordingly, the deferential standard used in the review of federal action is inappropriate. However, under § 503, the Commonwealth exercise authority over its immigration, thus possessing authority not exercised by the states. Therefore, in this context, the standards applicable to the several states are not necessarily appropriate for the review of Commonwealth immigration legislation.

[11]/ Brief of the Appellants, p.32.

1104

Naturalization Service, 601 F.2d 459, 467 (9th Cir. 1979).

Sirilan's fall-back position is more interesting. He argues that assuming, arguendo, that federal courts would apply only the narrow standard of review on the instant facts, this panel should reject this deferential approach here based on the unique political situation existing in the Northern Mariana Islands. While we reject his other arguments,[12] we find his contention regarding the distinguishing features of the Commonwealth worthy of closer examination.

### B.

The United States Supreme Court has consistently supported its hesitation to closely scrutinize federal immigration matters with statements regarding the interweave of the national powers over foreign affairs, defense and immigration. In Fong Yue Ting v. United States, 149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905 (1893), the Court so justified its conclusion that decisions of the government of the United States regarding immigration are conclusive upon the judiciary. In reaching this conclusion, the Court reiterated its position that the absolute

- - - - - - - - -

[12] Sirilan's attempt to distinguish the facts before us from the facts of the federal immigration cases on the basis of whether the challenged action excludes or regulates aliens fails. The federal courts have displayed equal hesitation in the review of action regulating internal alien affairs as it has in cases involving the admission or expulsion of aliens. See, e.g., Hampton v. Mow Sun Wong, 96 S.Ct. at 1905 (in review of federal employment classification, Court exercised narrow judicial review); Mathews v. Diaz, 96 S.Ct. at 1892 (welfare regulation regarding aliens subject only to narrow review.)

and unqualified authority over alien affairs derives from the nation's inherent power "[t]o preserve its independence, and give security against foreign aggression and encroachment." 13 S.Ct. at 1019 (quoting Chae Chan Ping v. United States (The Chinese Exclusion Case), 130 U.S. 581, 606, 9 S.Ct. 623, 630, 32 L.Ed. 1068, 1075 (1888)). "The power to exclude or to expel aliens," Justice Gray concluded for the Court, is "a power affecting international relations [and] is vested in the political departments of the government." 13 S.Ct. at 1022.

In Harisiades v. Shaughnessy, 72 S.Ct. at 519, the Court found it "pertinent to observe" that "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." Such conclusions have been repeatedly reiterated. See, e.g., Plyler v. Doe, 102 S.Ct. at 2405 (Powell, J. concurring); Toll v. Moreno, 458 U.S. 1, 10, 102 S.Ct. 2977, 2982, 73 L.Ed.2d 563, 572 (1982)(federal authority to regulate status of aliens derives from its broad authority over foreign affairs).

It is this perceived inextricable interrelationship between the powers over foreign policies and immigration that persistently appears in the Court's justification of its hands-off policy toward immigration cases. The matters composing the intricate interweave discussed in Harisiades "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." 72 S.Ct.

at 519. See also Haig v. Agee, 453 U.S. 280, 292, 101 S.Ct. 2766, 2774, 69 L.Ed.2d 640, 652-653 (1981). In Hampton v. Mow Sun Wong, the Court repeated earlier statements that "the power over aliens is of a political character and therefore subject only to narrow judicial review." 96 S.Ct. at 1904 n.21. The foundation of the Court's position was repeated in Mathews v. Diaz, wherein Justice Stevens for the majority explains that: "[t]he reasons that preclude judicial review of political questions [footnote omitted] also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization." 96 S.Ct. at 1892.

The authority of the Commonwealth over immigration matters derives not from its Constitution but from the Covenant. Section 503 provides that the immigration and naturalization laws of the United States shall not apply to the Commonwealth except to the extent made so applicable by Congress, in effect giving the Commonwealth the authority to regulate its own immigration. However, the full inherent powers of sovereign nations discussed in the Supreme Court cases are not exercised by the Commonwealth.[13] Section 104 provides:

> The United States will have complete responsibility for and authority with respect to matters relating to foreign affairs and defense affecting the Northern Mariana Islands.

------

[13] We intend to advance no opinion regarding the Commonwealth's rights of consultation as to foreign affairs under Art. IX of the Covenant.

In light of these provisions, the Commonwealth's authority over immigration affairs significantly differs from the power exercised by the United States over its alien affairs.

Additionally, the constitutional limits which constrain the exercise of immigration authority of the United States are not identical to those which restrict the powers of the Commonwealth. Congressional authority is limited in its exercise by the Due Process Clause of the Fifth Amendment. While "discrimination may be so unjustifiable as to be violative of due process," Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884, 886 (1954), substantial question exists as to whether equal protection guaranties of the Fifth Amendment are coextensive with those of the Fourteenth Amendment. See, e.g., id. at 694 (refusal to imply that the two phrases are interchangeable); Hampton v. Mow Sun Wong, 96 S.Ct. at 1904 (the two protections are not always coextensive). See also G. Rosberg, supra p.12, at 287. Thus, a persuasive argument could be advanced that the Commonwealth's authority is exercised under stricter limits imposed by the Fourteenth Amendment than is the parallel authority of the United States.

More importantly, however, Sirilan seeks protection under the Commonwealth Constitution. Equal protection guaranties are found in Art. I, Sec. 6, which reads:

> No person shall be denied the equal protection of the laws. No person shall be denied the enjoyment of civil rights or be discriminated against in the exercise thereof on account of race, color, religion, ancestry or sex.

The language is not a verbatim repetition of the Fourteenth Amendment. Immediately striking is the fact that the protection extends to all persons, not only to those "within its jurisdiction." Also, the prohibited discriminations are facially explicit and arguably more inclusive than those encompassed by the Fourteenth Amendment.

We are of the opinion that the distinctions between the immigration powers of the Commonwealth and those of the United States are significantly substantial to require a new analysis under the Commonwealth's own constitution to determine whether the standards which have evolved under the Fourteenth Amendment for the review of alien affairs are appropriate in the unique setting of the Northern Mariana Islands.

C.

It is well established under federal law that a state may afford greater protections to persons within its jurisdiction than does the federal government. See generally J. Falk, The Supreme Court of California, 1971-1972, Foreword: The State Constitution: A More Than "Adequate Nonfederal Ground, 61 Cal.L.Rev. 273 (1973). The Supreme Court has stated that "even though a state court's opinion relies on similar provisions in both the State and Federal Constitutions, the state constitutional provision has been held to provide an independent and adequate ground of decision." Jankovich v. Indiana Toll Road Commission, 379 U.S. 487, 491-2, 85 S.Ct. 493, 495-6, 13 L.Ed.2d

**439, 443 (1965).** The California Supreme Court concurs:

> In short, the Supreme Court has
> clearly recognized that state
> courts are the ultimate arbiters of
> state law, even textually parallel
> provisions of state constitutions,
> unless such interpretations purport
> to restrict the liberties guaran-
> teed the entire citizenry under the
> federal charter.

People v. Brisendine, 13 Cal.3d 528, 548, 531 P.2d 1099, 1112, 119 Cal.Rptr. 315, 328 (1975). The determination that citizens are entitled to greater protection under the state constitution than that required by the United States Constitution does not signal embarkation on a "revolutionary course." 119 Cal.Rptr. at 329. Rather, the California Supreme Court continues, "we are simply reaffirming a basic principle of federalism--that the nation as a whole is composed of distinct geographical and political entities bound together by a fundamental federal law but nonetheless independently responsible for safeguarding the rights of their citizens. 119 Cal.Rptr. at 329-330. See also, e.g., State v. Santiago, 53 Haw. 254, 265, 492 P.2d 657, 664 (1971) (Hawaii Supreme Court's statements regarding independent interpretations of parallel provisions of the state constitu-tion).

Reference to and reliance on the Commonwealth's inde-pendent constitutional provisions does not represent merely an available option but reflects a fundamental duty imposed upon us as judges of the highest court of the Commonwealth. The politi-cal relationship between the Commonwealth and the United States

is unique. Under Section 103 of the Covenant, the "people of the Northern Mariana Islands will have the right of local self-government and will govern themselves with respect to internal affairs in accordance with a Constitution of their own adoption." The Constitution embodies the "traditions and hopes" of the people for the Commonwealth.[14] Thus, when the circumstances of a case are such that the provisions of the United States Constitution as they have been interpreted by the United States Supreme Court do not reflect the values of the people of the Commonwealth, we will not hesitate to look to the Commonwealth's Constitution for the protections and guaranties placed therein by and for the people. "[S]uch independent construction does not represent an unprincipled exercise of power, but a means of fulfilling our solemn and independent constitutional obligation to interpret the safeguards guaranteed by the California Constitution in a manner consistent with the governing principles of California law." Committee to Defend Reproductive Rights v. Myers, 172 Cal.Rptr. 866, 870-871 (1981)(emphasis in original).

> [J]ust as the United States Supreme Court bears the ultimate judicial responsibility for determining matters of federal law, this court bears the ultimate judicial responsibility for resolving questions of state law, including the proper interpretation of provisions of the state Constitution. [Citations omitted]. In fulfilling this difficult and grave responsibility, we cannot properly relegate our

- - - - - - - - - -

[14] Preamble to Constitution of the Northern Mariana Islands.

1111

> task to the judicial guardians of
> the federal Constitution, but in-
> stead must recognize our personal
> obligation to exercise independent
> legal judgment in ascertaining the
> meaning and application of state
> constitutional provisions.

People v. Chavez, 26 Cal.3d, 334, 352, 605 P.2d 401, 412, 161 Cal.Rptr. 762, 773 (1980).

For these reasons, we are of the opinion that the facts of this case require an application of the independent provisions of the Commonwealth Constitution.

## VI.

We now turn to a discussion of the standard of review appropriate for equal protection of alien legislation under the Commonwealth Constitution. As noted above, the federal courts have developed a relaxed standard of review when addressing challenges to federal legislation regarding aliens; this, as opposed to the strict review of similar state classifications. We discuss here the two major justifications for this bifurcated test to determine whether such rationales apply to analogous Commonwealth legislation.

### A.

As we discussed in Part V, federal courts have often supported their reluctance to review immigration questions because of a belief that "the power over aliens is of a political character and therefore subject only to narrow judicial review." Hampton v. Mow Sun Wong, 96 S.Ct. at 1904 n.21. "The reasons

1112

that preclude judicial review of political questions [footnote quoting Baker v. Carr, infra omitted] also dictate a narrow standard of review of decisions made... in the area of immigration and naturalization." Mathews v. Diaz, 96 S.Ct. at 1892. A court's refusal to address issues involving political questions is not founded on any explicit constitutional command, but "on a sensitive appreciation of the relationship between the judiciary and the coordinate branches of the federal government." In Re 68 Filipino War Veterans, 406 F.Supp. at 944. A review of the factors which guide courts regarding justiciability convinces us that deference is not warranted under the facts presented.

In Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), Justice Brennan set forth a comprehensive set of guidelines by which issues were to be examined to determine whether the questions presented are justiciable:[15]

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack

— — — — — — — — —

[15] Justiciability refers to a discretional deference to the review of a case rather than to a lack of subject matter jurisdiction. Baker v. Carr, 82 S.Ct. at 700.

> of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

82 S.Ct. at 710. No dismissal is warranted under the political question doctrine unless one of these factors "is inextricable from the case at bar." Id.

The authority of Congress over the immigration affairs of the United States is committed to that branch by Section 8 of the Constitution which grants Congress the power to "establish a uniform Rule of Naturalization." This textual commitment of authority over alien matters has played a part in several of the Supreme Court's decisions which have found actions in this field largely political and substantially unreviewable. See, e.g., Fong Yue Ting v. United States, 13 S.Ct. at 1021. Under the Covenant, on the other hand, the immigration authority of the U.S. Congress is explicitly withheld[16] leaving the power to regulate these matters with "[t]he people of the Northern Mariana Islands."[17] Thus, under this factor a relevant distinction exists between the authority exercised by Congress and that exercised by the Commonwealth.

— — — — — — — — — —

[16] Sec. 503(a).

[17] Sec. 103. The Constitution is silent as to the delegation of this authority to either branch.

1114

Second, Baker suggests we look for a "lack of judicially discoverable or manageable standards." Sirilan raises a traditional equal protection argument wherein he challenges a legislative classification. The standards of equal protection have evolved since the enactment of the Fourteenth Amendment and are now "well developed and familiar." Baker v. Carr, 82 S.Ct. at 715. That we may have to modify some of these concepts to better work within the setting of the Northern Mariana Islands does not render the standards "undiscoverable" or "unmanageable."

Third, a judicial decision in this case will not necessitate an "initial policy determination" clearly not within the proper judicial realm. Under the equal protection review, authority of the legislature to establish policy is not challenged; rather, Sirilan attacks the method of implementation. As the Supreme Court stated the term before last in rejecting challenges of non-justiciability, "[t]he plenary authority of Congress over aliens under Art. I, §8, cl.4 is not open to question, but what is challenged here is whether Congress has chosen a constitutionally permissible means of implementing that power." I.N.S. v. Chadha, ____ U.S. ____, ____, 103 S.Ct. 2764, 2779, 77 L.Ed.2d 317, 338 (1983). Similarly, under the complaint raised herein, we are looking not at initial policy determinations, but at the constitutionality of the implementation of those policies.

The danger of showing a "lack of respect" does not deter us here as it is the proper role of the courts to safeguard the rights of the individual and ensure that the exercise of

1115

national or state authority remains within constitutional limits. Also, this issue presents no unusual need for "unquestioning adherence to a political decision already made." A finding that the particular line drawn violates equal protection will not require major policy change or otherwise place the Commonwealth in an awkward or embarrassing position. Such a decision simply requires minor changes in administrative implementation of stated policies.

Under the Baker test, then, we are of the opinion that the factors which caused the federal courts to treat immigration challenges as quasi-political questions do not exist with equal force in the Commonwealth. In adopting a standard regarding judicial review of government action in the field of immigration affairs, we must remember, the doctrine which we now consider "is one of 'political questions,' not one of political cases." The courts "cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority." Baker v. Carr, 82 S.Ct. at 710. There is no doubt that Sirilan's cause is "political." Indeed, many cases involving challenges to a wide variety of government can be so-called.

> But the presence of constitutional
> issues with significant political
> overtones does not automatically
> invoke the political question doc-
> trine. Resolution of litigation
> challenging the constitutional
> authority of one of the three
> branches cannot be evaded by courts
> because the issues have political
> implications... .

1116

I.N.S. v. Chadha, 103 S.Ct. at 2780. Accordingly, we reject the argument that the political nature of the legislation at issue mandates a standard of review which is more deferential to governmental interests than would be the test used to review other pieces of legislation.

B.

The second justification the Supreme Court has used to justify the relaxed standard of review is the plenary power theory. In Graham v. Richardson, 91 S.Ct. at 1848, the Court applied strict scrutiny review to find unconstitutional requirements that aliens meet state durational residency minimums before becoming eligible for state public assistance payments. Yet, when nearly identical federal requirements were challenged, the Court, rejecting strict scrutiny review in favor of a deferential standard, held that "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." Mathews v. Diaz, 96 S.Ct. at 1891. Citing important national interests with respect to alien affairs, the Court was of the opinion that "[t]he fact than an Act of Congress treats aliens differently from citizens does not in itself imply that such disparate treatment is 'invidious'." Id.

In Sugarman v. Dougall, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973), the Court struck down, under strict scrutiny review, a New York statute which restricted employment in the state's civil service to United States citizens. However, when

1117

an equal protection challenge was brought to a similar _federal civil service_ regulation, the Court held that "the paramount federal power over immigration and naturalization forecloses a simple extension of the holding in _Sugarman_." _Hampton v. Mow Sun Wong_, 96 S.Ct. at 1904. Although the Court acknowledged that the regulation was subject to "some judicial scrutiny," the Court rejected strict scrutiny and instead held that, so long as the rule is adopted by Congress or the President, "we might presume that any interest which might rationally be served by the rule did in fact give rise to its adoption." 96 S.Ct. 1905.[18]/

We decline to adopt the Supreme Court's reasoning here. First, as stated above, the Commonwealth's authority with regard to immigration and naturalization is sufficiently distinguishable from that exercised by the United States. Second, even though the United States or the Commonwealth may well possess compelling reasons for enacting certain classifications which would not survive review if passed by a state, such rationales properly work within the stricter standard of review; they do not justify a more circumscribed judicial scrutiny. In other words, government assertions that the reasons supporting the legislation are indeed compelling would survive even the most strict

- - - - - - - -

[18]/ The regulation in _Hampton_ was in fact struck down because the Civil Service rather than the President or Congress promulgated it. However, President Ford's subsequent Executive Order reimplementing the same regulation was upheld. _Mow Sun Wong v. Campbell_, 626 F.2d 739 (9th Cir. 1980), cert. denied, 450 U.S. 959, 101 S.Ct. 1419, 67 L.Ed.2d 384 (1981).

1118

review.[19] Accordingly, we are not convinced that alleged compelling governmental interests require us to adopt a narrow standard of review in this case.[20]

 C.

 The appropriate standard is more difficult to define. We agree with the holding of Graham v. Richardson that aliens are "a prime example of a 'discrete and insular' minority." 91 S.Ct. at 1852. Non-citizens are denied the right to vote and therefore "lack the most basic means of defending themselves in the political processes." Purdy & Fitzpatrick v. State, 456 P.2d 645, 654, 79 Cal.Rptr. 77, 86 (1969). Aliens are prohibited from holding high elective or political office.[21] Professor Rosberg

- - - - - - - - -

[19] See generally G. Rosberg, supra p.12, at 294; Note-Constitutional Limits, supra p.13 note 7, at 974. In fact, it is interesting to note what happened when the courts considered President Ford's executive order reimplementing the regulation struck down in the Mow Sun Wong litigation. The district court, Mow Sun Wong v. Hampton, 435 F.Supp. 37 (N.D.Cal. 1977), refusing the proffered deferential test, applied an "intermediate scrutiny" under which the government's interests proved sufficiently important and substantially related to the objective to withstand a stricter review.

[20] To the extent that power over immigration has been viewed as one inherent to sovereign nations and accordingly outside the scope of judicial review, see, e.g., The Chinese Exclusion Case, 9 S.Ct. at 629 and Harisiades v. Shaughnessy, 72 S.Ct. at 518, we decline to adopt this position. We are not convinced that governmental authority defined as "inherent" should operate outside the specific limitations of the Constitution. See G. Rosberg, supra p. 12, at 320-321.

[21] The Commonwealth Constitution requires that a senator, representative or governor be a qualified voter, and that a judge be a United States citizen or national.

1119

sets forth persuasive arguments that the exclusion of aliens from the political processes extends further. "Many aliens have come... from countries where active political participation is not encouraged," he argues, leaving them without a "taste for the kinds of activity--joining political groups, sending letters to government officials, dramatizing grievances, and the like--that often play a more important role than voting in shaping governmental policy." G. Rosberg, supra p.12, at 304. Additionally, aliens are subject to deportation on any one of several grounds, some of which include conduct which is not otherwise illegal.[22] Also, aliens are subject to numerous regulations regarding entry and stay which are not applicable to citizens.[23] Of course, aliens have historically been subject to harrassment, intimidation and discrimination by government and non-government sources.[24] As Professor Rosberg notes, "[t]hese experiences are more likely to bring out fear of governmental authority than a desire to participate, actively in political affairs so as to influence the exercise of that authority." Id. at 305.

Our concern for the potential for invidious discrimination against aliens leads us to reject the standard rational basis test. That standard allows a classification to withstand

_ _ _ _ _ _ _ _

[22] See, e.g., 3 CMC §§4304-5.

[23] See generally 3 CMC § 4301 et. seq.

[24] See, e.g., C. Wollenberg, All Deliberate Speed (1976)(documenting discrimination in education against aliens in California).

scrutiny if there exists any conceivable set of facts which could reasonably support the state policy. As Professor Tribe notes, "[t]his remarkable deference to state objectives has operated... quite apart from whether the conceivable 'state of facts' (1) actually exists, (2) would convincingly justify the classification... or (3) has ever been urged in the classification's defense." L. Tribe, supra p.8, at 996. He concludes that "[o]ften only the Court's imagination has limited the allowable purposes ascribed to government." Id. We feel that this degree of deference gives a discretion to the legislature which is too broad. Where the subject of the legislation is a traditionally underrepresented class, a "suspect class," such as aliens, the ability to camouflage invidious discrimination behind a facade of imaginable justifications is too great.

Sirilan asks us to adopt the strict scrutiny standard under which the classification, to survive review, must be proven to be necessary to the achievement of a compelling government objective. We have already expressed our opinion that a classification based on alienage is suspect and mandates the searching review that Sirilan urges. However, as we noted above, the classification here does not discriminate against aliens per se. Rather the line classifies among members of the alien class. Thus, the potential for invidious discrimination is not as great. Accordingly, strict scrutiny is not appropriate.

///

///

Sirilan advances as a second basis for triggering strict scrutiny the fact that the denial of permanent residency infringes upon fundamental rights to "remain in the Commonwealth permanently" and to "earn a livelihood." Sirilan's argument is not persuasive. First, the right to earn a livelihood has not been curtailed here. Sirilan is not prevented by P.L. 2-17 from pursuing his chosen profession. Second, while we are sensitive to Sirilan's complaints of separation from his chosen community, we do not consider the right of an alien to remain in the Commonwealth to be so fundamental as to be implicitly protected by the Constitution. We do, however, consider the interest to be sufficiently important to trigger an intermediate scrutiny.

Sirilan, and others like him, have settled into society here with hopes and expectations of making the islands their permanent home.[25] They have resided in the islands' villages and communities for upward of five years and have been members in good standing of society.[26] They have paid taxes[27] and contrib-

///

///

///

------------

[25] See, e.g., Affidavit of Bernardo P. Galang in Support of Plaintiffs' Motion for Summary Judgment.

[26] See, e.g., Affidavit of Bartolome Baladad in Support of Plaintiffs' Motion for Summary Judgment at ¶4.

[27] Under 4 CMC § 1101 et. seq., nonresident workers are not exempt from the revenue code.

uted labor[28]/and capital to the growth of their communities.[29]/
Many, presumably, have made friends and started families. The
notion that these ties are deserving of protection has become
increasingly accepted throughout the century. See Note, Develop-
ments in the Law-Aliens, supra p.13 note 7, at 1303-8.

The Court's decision in Plyler v. Doe, rendered the
term before last, implicitly recognized the importance of an
alien's ties to society. At issue was a Texas law which denied
free public education to undocumented aliens. The Court rejected
petitioners call for adoption of a strict scrutiny review finding
that the class of undocumented alien children was not suspect nor
was education a fundamental right under previous decisions of the
Court. However, the Court subjected the statute to heightened
scrutiny. Justice Brennan, writing for the majority, found that
education's role in the foundations of our society and value to
the individual were of "supreme importance." 102 S.Ct. at 2397
(quoting Meyer v. Nebraska, 262 U.S. 390, 400, 43 S.Ct. 625, 627,
67 L.Ed.2d 1042, (1923)). "[E]ducation provides the basic tools
by which individuals might lead economically productive lives to

_ _ _ _ _ _ _ _

[28]/Nonresident workers are allowed to remain in the Commonwealth
 as long as they are employed. 3 CMC § 4435(a).

[29]/These contributions have been recognized by the Supreme Court.
 In In Re Griffiths, 413 U.S. 717, 722, 93 S.Ct. 2851, 2855, 37
 L.Ed.2d 910, 915 (1973), the Court noted that resident aliens
 "pay taxes, support the economy... and contribute in myriad
 other ways to our society," in its conclusion that a State
 bears a "heavy burden" when it deprives aliens of employment
 opportunities. See also Sugarman v. Dougall, 93 S.Ct. at
 2849.

the benefit of us all" and has "a fundamental role in maintaining the fabric of our society." Id. Additionally, the Court found that the deprivation of education would have an "inestimable toll" on the "social, economic, intellectual and psychological well-being of the individual." Id. Considering these concerns, the Court found that the statute cannot withstand constitutional challenge unless "it furthers some substantial goal of the State." 457 U.S. at 224.

In Developments in the Law-Aliens, supra p.13 note 7, the author advances a well-reasoned and convincing argument that one's interest in being allowed to stay in the society into which he or she is assimilated is similarly important and deserving of heightened scrutiny. Continued residence, like public education, she argues, plays an "essential role" in the well-being of the individual. Human liberty, she continues, includes "the freedom to seek out and maintain a complex web of associations" such as ties "to family and friends, to a place of work or an educational environment, to a political or social arena," 96 Harv.L.Rev. at 1329-30; the decision not to recognize a person's interests in the continuation of his or her ties to the community "operates to sever all of the individual's ties that together yield the possibility for human development and achievement." Id. (emphasis hers). The author concludes that "to deprive an individual of the opportunity to participate in the life of a community to which she has become attached is to divest the individual of a fundamental aspect of human liberty", id. at 1324, and must be

shown to be "substantially related to an important governmental interest." Id. at 1330-31.

We adopt this analysis. Although their interests may not be "fundamental", Sirilan and others like him have a significant and constitutionally protectable interest in the freedom from being torn from their chosen communities--their work, families and friends--without proof that such action serves counterveiling governmental interests. We hold that these interests are sufficiently important to deserve a more searching review than that urged by the government.

The Supreme Court has developed an intermediate standard of review for situations wherein classifications burden interests which although not necessarily fundamental, are considered important, or where the classification affects a semi-suspect class. See L. Tribe, supra p.8, at 1089-90. Under this review, the classification "must serve important governmental objectives and must be substantially related to the achievement of those objectives." Craig v. Boren, 429 U.S. 190, 198, 97 S.Ct. 451, 457, 50 L.Ed.2d 397, 407 (1976).

Professor Tribe has drawn from the Supreme Court cases utilizing this intermediate review five factors which have been used to guide courts in assessing the constitutionality of certain classifications. L. Tribe, supra at 1082-1089.

The first factor involves the importance of the objective. While the objective of the classification need not be "compelling" as under strict scrutiny, it must be of sufficient

1125

importance to justify the otherwise undesirable discrimination.

Second, the classification must present a "close-fit", that is, it must be substantially related to the achievement of the stated government interest.

Third is the requirement of "current articulation." The justification for the classification must be stated and urged in the defense of the classification. Under this factor, unlike more deferential standards, a discriminatory law will not stand merely because the court can imagine a possible rationale for the classification.

Associated with this articulation is the fourth element, that of limiting afterthought or pretextual rationalization. The asserted justification must actually have provided the basis on which the legislation was supported and must not have been supplied afterwards or as a mere pretext for an unlawful purpose.

Lastly, as an alternative to wholesale invalidation of the statute, the court will look at the legislation to determine whether it allows rebuttal in individual cases to show that application of the classification will not achieve the stated objectives.

Unless it is convincingly shown to the court that the first four factors have been met, or that the opportunity for rebuttal sufficiently saves the statute, the legislative classification cannot stand.

///

## D.

We have already found, under the due process review, that the legislature's desire to halt the granting of permanent residency status was supported by a rational basis. The question which we must now address is whether the distinction drawn between eligible non-citizens who have filed for the status and those who have not is substantially related to the achievement of the government's objective. The Commonwealth presents what we perceive to be two contentions in support of the classification.

First, they argue that the "line so drawn is the natural and common sense point of demarkation."[30] While we do not quarrel with this contention, it cannot alone support the line. Several options faced the legislature, each of which would have more or less met the objective of curtailing the issuance of permanent residency permits; that the line as drawn achieves the objective is not disputed. However, when faced with these choices, any one of which will discriminate against members of a suspect class or affect important interests of the members, we require that the line be finely tuned to best balance the competing government and individual interests. As importantly, the reasons supporting the chosen balance must be well supported and articulated. The Commonwealth has not provided this factual support either in the legislative history or in its pleadings

- - - - - - - - -

[30] Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment at 12.

1127

before the trial court[31] to demonstrate that the line chosen was in fact substantially related to the prevention of the asserted economic and social ills. On the other hand, there is evidence that the line significantly burdened members of the class in a very arbitrary fashion. The immediacy of the cut-off in real effect conditioned one's application status on April 23, 1981 on a myriad of factors, each one of which had potential for invidious discrimination. For instance, it was asserted that the certification program of the Saipan Mayor's office was replete with delay and at one point was halted altogether.[32] The failure to timely issue the certificate may well have prevented the obtaining of the desired status in some cases.[33] In other cases, potential applicants were unable to timely retrieve a host of documents required under the regulations which were only available in the prospective applicants' native country.[34] Yet others report the dissemination of misinformation by government officials which resulted in the failure to file applications.[35]

- - - - - - - - - -

[31] The government refused to supply statistics, requested through Interrogatory by Sirilan, which would have shed light on the number of non-citizens eligible for permanent residency status as of April 23, 1981. See Answer to Plaintiffs' First Set of of Interrogatories and Objections Thereto.

[32] See Affidavit of Federico Q. Acera in Support of Plaintiffs' Motion for Partial Summary Judgment.

[33] See Affidavit of Wenifredo O. Buenaflor in Support of Plaintiffs' Motion for Partial Summary Judgment.

[34] See Affidavit of Liz Buccat in Support of Plaintiffs' Motion for Partial Summary Judgment.

[35] Sec Affidavit of Demetrio V. Tupas in Support of Plaintiffs' Motion for Partial Summary Judgment.

1128

Such factors are none other than unreasonable, drawing arbitrary divisions between similarly situated individuals leaving ample opportunity for hidden, yet invidious discrimination.

In the absence of proof to demonstrate that sufficiently important government interests outweigh the arbitrariness of these determinants, we cannot agree that the selected line provides a sufficiently close fit. In Hampton v. Mow Sun Wong, the Supreme Court, faced with a similar paucity of evidence supporting the classification in question, refused to accept the government's proffered justification. "There is nothing in the record before us," the Court stated, "or in matter of which we may properly take judicial notice, to indicate that the Commission actually made any considered evaluation" of the competing interests. 96 S.Ct. at 1911. The Court concluded that "[a]ny fair balancing of the public interest in avoiding the wholesale deprivation" of the interests of a suspect class, "as opposed to what may be nothing more than a hypothetical justification, requires rejection of the argument... in this case." Id. Similarly, without factual proof that the immediate cut-off here imposed is necessary to prevent the feared adverse impacts, and in light of evidence as to the arbitrary nature of the effect of the line, it cannot be upheld on the bare assertion that it is "natural" and based on "common sense."

///

///

///

The Commonwealth also asserts in defense of the cut-off that it "lends itself to ease of interpretation and enforcement.[36] This justification presents nothing more than administrative convenience. In Stanley v. Illinois, 405 U.S. 645, 656 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551, 561 (1972), the Supreme Court said of such justifications that while "establishment of prompt, efficacious procedures to achieve legitimate state ends is a proper state interest worthy of cognizance in constitutional adjudication... the Constitution recognizes higher values than speed and efficiency." We agree. While ease of interpretation and enforcement is certainly an admirable quality of a statute, it cannot serve as the sole support of a discriminatory classification such as the one before us. Even the most arbitrary line is easy to administer and enforce so long as it is sufficiently defined.

## VII.

We hold today that legislation which discriminates among non-citizens or which infringes upon important individual interests will survive constitutional review only upon a convincing, well supported showing that the classificiation substantially serves to achieve important government interests. The line drawn in P.L. 2-17 has not been persuasively shown to so serve.

- - - - - - - - - -

[36] Brief of Appellee at 26 (quoting Summary Judgment Order (April 11, 1983) at 11).

Therefore, the decision granting summary judgment to the Commonwealth was in error. To now allow the government the opportunity on remand to reassert justifications of the classification would unacceptably encourage attempted retroactive rationalizations which would amount to nothing more than afterthought. Accordingly, we hold that the provisions of Section 2 of P.L. 2-17 prohibiting those non-citizens who qualified for permanent residency status on April 23, 1981 to so prove creates unconstitutional classifications and must fail. The trial court's decision denying Sirilan's Motion for Summary Judgment is in error.

We remand to the trial court to conduct further proceedings wherein the non-citizens who met the substantive qualifications for permanent residency status on April 23, 1981 be given a fair opportunity and reasonable time to complete and file their applications with the INO. This classification strikes a constitutionally permissible balance between the public interests advanced by the Commonwealth and the rights asserted by Sirilan.

///

///

///

///

///

///

///

///

The decisions of the trial court regarding the motions for summary judgment are REVERSED.

DATED: October 24, 1984.

_Herbert D. Soll_

HERBERT D. SOLL
Designated Judge

_Alfred Laureta_

ALFRED LAURETA
District Judge

_Judith N. Keep_

JUDITH N. KEEP
District Judge

1132